BERGER AND MONTAGUE, P.C.
Daniel Berger
Kendall S. Zylstra
Neil F. Mara
1622 Locust Street
Philadelphia, PA 19103-6365
(215) 875-3000

BYRNES & KELLER LLP
Bradley S. Keller, WSBA #10665
Keith D. Petrak, WSBA #19159
Jessica J. Fleck, WSBA #26490
1000 Second Avenue, 38th Fl.
Seattle, WA 98104
(206) 622-2000

The Honorable Robert H. Whaley

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAR 17 1999

JAMES R. LARSEN, CLERK

_____ DEPUTY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

ROBERT E. WHITE, et al.,

            Plaintiffs,

    v.

DR. C. ALVIN PAULSEN, et al.,

            Defendants.

_____

DON BYERS, et al.,

            Plaintiffs,

    v.

C. ALVIN PAULSEN, M.D., et al.,

            Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CS 97-0239 RHW

MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO CERTIFY
DEFENDANTS' QUALIFIED IMMUNITY
APPEAL AS FRIVOLOUS

Noted For Telephonic Oral Argument On
April 21, 1999 at 10:30 a.m.

## I. INTRODUCTION AND RELIEF REQUESTED

Nearly forty years ago, defendants Paulsen, Rhay and Conte began a series of non-consensual testicular radiation experiments at the Walla Walla State Penitentiary, using uneducated and vulnerable inmates as their unwitting subjects. In the decades that followed, the defendants concealed critical facts regarding the experiments in order to hide their transgressions, and avoid being sued.

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 1



1    Finally, when this Court denied the defendants' motions for summary judgment regarding the statute

2    of limitations and qualified immunity, the defendants recognized that the day was approaching when

3    they might have to answer for their conduct before a jury.  To try to further delay and avoid a trial,

4    the defendants filed a Notice of Appeal regarding the qualified immunity ruling.  This is a transparent

5    attempt to divest the trial court of jurisdiction and delay trial for several more years – a particularly

6    jarring tactic in a case where defendants have already forestalled adjudication for decades, and many

7    plaintiffs are in jeopardy of dying while defendants try to pursue legal niceties on appeal.

8        Defendants should not be allowed to further delay adjudication on the merits.  Because their

9    appeal is without merit, plaintiffs ask the Court to enter an order, under Chuman v. Wright, 960 F.2d

10   104 (9th Cir. 1992), certifying the appeal as frivolous.  In making this request, plaintiffs do not

11   contend that the qualified immunity defense, in and of itself, is frivolous.  Rather, plaintiffs contend

12   only that the defendants' claim that they are immune from liability as a matter of law is wholly

13   unsupported by the record.  Thus, defendants' appeal of the Court's denial of their motion for

14   summary judgment on the qualified immunity defense is frivolous, because the legal issues are well

15   settled, and the factual issues are not appealable at this time.  Significantly, an order certifying the

16   appeal as frivolous does not affect the appeal.  It does, however, allow this court to retain dual

17   jurisdiction during the appeal, and thus for the case to proceed to trial without further delay.

18                          II.  **PROCEDURAL BACKGROUND**

19       In September, 1998, defendants Paulsen, Rhay and Conte filed motions for summary

20   judgment, asking, among other things, that the claims against them be dismissed on statute of

21   limitations and qualified immunity grounds.  On January 20, 1999, this Court denied those motions.

22   See Exhibit A  ("SJ Order").  With regard to the qualified immunity motion, the Court held that the

23   right asserted by the plaintiffs, i.e. the right to be free from non-consensual medical experimentation,

24   was clearly established nearly twenty years before the Paulsen experiments were even commenced.

25   SJ Order at 24-25.  Further, the Court found that the record presented substantial questions of fact

26   regarding whether a reasonable official would have believed that the defendants' conduct was lawful.

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    Indeed, the Court noted that the record would "require substantial development" before one could

2    find for the defendants in this regard, even as a question of fact. SJ Order at 25.

3        By virtue of the Court's order, the case was ready to be set for trial. Then, on February 19,

4    1999, defendants Rhay, Conte and Paulsen filed a Notice of Appeal raising a single issue:

5            Whether the trial court erroneously declined to hold the plaintiffs'
              claims are barred, as a matter of law, under the qualified immunity
6            doctrine.

7    See Defendants' Attachment to Civil Appeals Docketing Statement at 1, attached hereto as Exhibit

8    B.[1] Defendants contend that, under Behrens v. Pelletier, 516 U.S. 299 (1996), Mitchell v. Forsyth,

9    472 U.S. 511 (1985), and Chuman v. Wright, 960 F.2d 104 (9th Cir. 1992), the Court's interlocutory

10   ruling on qualified immunity is immediately appealable as of right, and that filing the Notice of Appeal

11   divested the trial court of jurisdiction. See Joint Status Report, attached hereto as Exhibit C.

## III. ARGUMENT AND AUTHORITIES

### A.    The Court Has the Authority to Retain Jurisdiction by Certifying Defendants' Appeal as Frivolous.

Defendants seek an interlocutory appeal under the Collateral Order doctrine, which permits

interlocutory appeals of a small class of decisions "which finally determine claims of right separable

from, and collateral to, rights asserted in the action, too important to be denied review, and too

independent of the cause itself to require that appellate consideration be deferred until the whole case

is adjudicated." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, (1949). In Mitchell v.

Forsyth, 472 U.S. 511 (1985), the Supreme Court held that the denial of a defendant's motion for

---

[1] Other appellants have argued that a court cannot certify an appeal as frivolous based simply on a Notice of Appeal, because it cannot know the subject matter of the appeal from the notice of appeal itself. This argument was summarily dismissed in Thompson v. Farmer, 945 F. Supp. 109 (W.D.N.C. 1996), in which the court observed that it acquired sufficient knowledge regarding the nature of a potential appeal when ruling on summary judgment motions. Because the defendants cannot raise new theories on appeal, this Court is in a position to know the frivolous nature of the appeal.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  summary judgment based on qualified immunity was a "collateral order" for which interlocutory

2  appeal was available.

3        Even as they permitted interlocutory appeals of qualified immunity orders, however, members

4  of the Supreme Court recognized the potential for abuse, i.e., that such appeals were "a potent

5  weapon to use against plaintiffs, delaying litigation endlessly with interlocutory appeals" and denying

6  "full and speedy justice to those plaintiffs with strong claims on the merits and a relentless and

7  unnecessary increase in the caseload of appellate courts." Mitchell v. Forsyth, 472 U.S. at 556

8  (Brennan, J. concurring in part and dissenting in part).  To limit such abuse, interlocutory appeals

9  regarding rulings on qualified immunity are limited strictly to issues of law, and are not permitted for

10 rulings which turn on issues of fact. Id. at 530; Johnson v. Jones, 515 U.S. 304 (1995).  Further, the

11 district courts have the authority to retain jurisdiction if the appeal has been waived, or if it certifies

12 the appeal as frivolous. Chuman, 960 F.2d  at 105; Behrens v. Pelletier, 516 U.S. 299, (1996)

13 (recognizing authority of district courts to certify qualified immunity appeal as frivolous); Apostol v.

14 Gallion, 870 F.2d 1335, 1339 (7th Cir. 1989) (same);  Yates v. City of Cleveland, 941 F 2d 444, 448-

15 49 (6th Cir. 1991) (same); Stewart v. Donges, 915 F.2d 572, 577 (10th Cir. 1990) (same).  Such

16 certification creates dual jurisdiction with the appellate court, thus allowing trial to proceed during the

17 appeal. Chuman at 105.

18        In its order denying defendants' motions for summary judgment, the Court considered three

19 issues regarding the qualified immunity defense:

20            Three elements must be established to invoke qualified immunity:
            (1) the right asserted must be identified; (2) the right must have
21            been clearly established when the wrongful acts occurred; and (3) a
            reasonable official could not have believed his acts were lawful.
22
   S.J. Order at 24.  As discussed below, the first two issues are questions of law, for which the appeal is
23
   frivolous under controlling caselaw.  As to the reasonableness of the defendants' conduct, plaintiffs
24
   do not contend that the defendants cannot raise this defense at trial.  However, given the record in
25
   this case, it is clearly a factual issue.  Thus, it is not properly the subject of an interlocutory appeal,
26

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    and the appeal of the Court's denial of defendants' motion for summary judgment on this issue is

2    therefore frivolous.

3    **B.    The Appeal of the Court's Ruling Regarding the Nature of the Rights Asserted by Plaintiffs Is Frivolous.**

4        The only issues of law which can properly be raised before the Court of Appeals at this time

5    are whether the rights asserted by the plaintiffs were identified and clearly established at the time

6    when the wrongful conduct occurred.  In this regard, the Court ruled that the right asserted by

7    plaintiffs, i.e., the right to be free from non-consensual human experimentation, was identified and

8    established well before 1946, twenty years before the Paulsen experiments were conceived and

9    perpetrated, citing <u>Stadt v. University of Rochester</u>, 921 F.Supp. 1023, (W.D.N.Y. 1996).  SJ Order

10   at 24-25.  In so holding, the <u>Stadt</u> court relied on no less than <u>four</u> Supreme Court cases:

11

12           See <u>Albright v. Oliver</u>, 510 U.S. 266, 114 S. Ct. 807, 812, 127
             L.Ed.2d 114 (1994) (finding that "the protections of substantive
             due process have for the most part been accorded to matters
13           relating to marriage, family, procreation, and the right to bodily
             integrity.") (citations omitted); <u>Schmerber v. California</u>, 384 U.S.
14           757, 772, 86 S. Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) (stating
             that "[t]he integrity of an individual's person is a cherished value of
15           our society."); <u>Skinner v. State of Oklahoma ex rel. Williamson</u>,
             316 U.S. 535, 541, 62 S. Ct. 1110, 1113, 86 L.Ed. 1655 (1942)
16           (holding that sterilization performed without consent deprived the
             individual of a "basic liberty."); <u>Union Pacific Railroad Co. v.
17           Botsford</u>, 141 U.S. 250, 251, 11 S. Ct. 1000, 1001, 35 L.Ed. 734
             (1891) (finding that "no right is held more sacred, or is more
18           carefully guarded, by the common law, than the right of every
             individual to the possession and control of his own person, free
19           from all restraint or interference of others, unless by clear and
             unquestionable authority of law.").

20   <u>Stadt</u> at 1027. [2]  There can be no appeal where the Supreme Court has decided the issue. Given such

21   clear authority, defendants' appeal of the Court's ruling on these first two legal issues is frivolous.

22

23

24           [2] <u>See also</u> <u>In Re Cincinnati Radiation Litig.</u>, 874 F. Supp. 796 (S.D. Ohio 1995) (right to be
     free from non-consensual human experimentation was clearly established by 1946, adopting <u>Stadt</u>);
25   <u>Bibeau, et al. v. PNRF, et al.</u> No. 95-6410, slip op. at 25-29 (D. Ore. Sept. 27, 1996) at 25-29 (same;
     relying on <u>Stadt</u>, <u>In Re Cincinnati</u> and supporting cases), attached hereto as <u>Exhibit D</u>.  Furthermore,
26   plaintiffs are unaware of any similar government-sponsored human radiation case where <u>any</u> court,

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 5

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

C.    **The Appeal of the Court's Ruling Regarding the Reasonableness of Believing That the Conduct Was Lawful Is Frivolous.**

1.    **The Ruling Is Factual in Nature, and Thus Is Not Immediately Appealable.** [3]

The Collateral Order doctrine allows interlocutory appeal only of issues of law. Where a qualified immunity summary judgment is denied because of disputed issues of fact, however, the order is not immediately appealable. Johnson v. Jones, 515 U.S. 304, (1995). In so holding, the Supreme Court reasoned that 1) its own precedent, in Mitchell v. Forsyth, only allowed appeals for denial of a claim of qualified immunity to the extent that it turns on an issue of law; 2) the factual nature of the inquiry does not render the summary judgment determination a "final decision" under 28 U.S.C. §1291; and 3) the underlying policies, including the danger of denying justice by delay and the relative expertise of trial judges in determining the existence or nonexistence of triable issues of fact support the conclusion that fact-based qualified immunity appeals are inappropriate. Id. at 313-315. Thus, qualified immunity motions that fail because of "evidence sufficiency," i.e., which facts a party may, or may not, be able to prove at trial, are not appealable. Id. at 313.

The defendants' argument on summary judgment, in essence, was that their conduct was reasonable as a matter of law, and thus there is no question of fact regarding whether other reasonable officials in similar circumstances would have believed the defendants' condut to be legal. However, the record reflects evidence from which a jury could conclude that the defendants conducted non-consensual human radiation experiments on inmates who, by virtue of their incarceration, were unable to consent to such procedures. Moreover, the record includes evidence that the defendants procured the inmates' cooperation by a series of material fraudulent

---

trial or appellate has granted any defendant's qualified immunity motion. Defendants cited no authority to the contrary.

[3] Plaintiffs do not ask this Court to determine the jurisdiction of the Court of Appeals. However, this Court can make a determination that an order is not immediately appealable, and for that reason certify the appeal as frivolous. See Bean v. City of Buffalo, 822 F. Supp. 1016 (W.D.N.Y. 1993) (certifying qualified immunity appeal as frivolous because of the need to resolve genuine issues of material fact).

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 6

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    misrepresentations and omissions regarding the risks of the radiation, and through coercive promises

2    of monetary compensation and favorable treatment, including possible early parole.  The Court held

3    that whether other reasonable officials would have believed the defendants' actions to be legal was

4    not a matter of law, "but of moral perception.  The record will require substantial development to

5    determine if what was going through defendants' minds at this time could have reasonably gone

6    through the minds of those similarly situated."  SJ Order at 25 (emphasis added).  Thus, the necessary

7    inquiry is overwhelmingly and indisputably factual.  Under Johnson, the SJ Order regarding the

8    reasonableness of a belief that such conduct was legal is not appealable at this juncture.

9          Numerous other courts have held that a denial of qualified immunity is not properly the

10   subject of an interlocutory appeal (and, therefore, is frivolously appealed) where the denial was

11   premised upon existence of factual issues.  See Bean v. City of Buffalo, 822 F.Supp. 1016 (W.D.N.Y.

12   1993) (qualified immunity appeal frivolous because fact-related); Heller v. Woodward, 735 F. Supp.

13   996 (D.N.M. 1990)(same).  This is particularly so when the issue turns on the perceived

14   reasonableness of the conduct at issue.  See, e.g., Dickerson by and Through Stephens v. McClellan,

15   844 F.Supp. 391 (M.D. Tenn. 1994)(where dispute is about the actions of the reasonableness of the

16   defendant's actions, an appeal from denial of a motion for summary judgment should be deemed

17   frivolous), vacated in part on other grounds, 37 F.3d 251 (6th Cir. 1989).  This reasoning makes

18   perfect sense:  If there are factual issues, an appellate court is powerless to resolve them.  Facts

19   relevant to the qualified immunity defense must be adjudicated in the trial court, and in this case, by a

20   jury.  Witnesses will testify, the jury will credit or reject that testimony, and the factual issues will be

21   resolved at trial.

22         Plaintiffs reiterate that they do not contend that a qualified immunity defense, in and of itself,

23   is frivolous.  Nor do they contend that the defendants cannot pursue this defense at trial.  However,

24   because whether a reasonable official would have believed that defendants' conduct was legal is

25   undeniably a factual issue, it therefore does not present an issue of law, and cannot be the subject of

26

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  an interlocutory <u>Forsyth</u> appeal.  Any appeal of a ruling denying defendants' motion for summary

2  judgment on this issue is therefore frivolous.

3          **2.**      **<u>The Appeal Is Frivolous on This Record.</u>**

4        A frivolous qualified immunity appeal is one that is "unfounded; so baseless that it does not

5  invoke appellate jurisdiction." <u>Apostol v. Gallion</u>, 870 F.2d 1335, 1339 (7th Cir. 1989); <u>Marks v.</u>

6  <u>Clarke</u>, 102 F.3d 1012, 1017 n.8 (9th Cir. 1996), <u>cert. denied</u> ____U.S. _____, 118 S. Ct. 264 (1997).

7  Another court, certifying a qualified immunity appeal as frivolous, defined the standard as follows:

8          [I]f in the district court's judgment there are true factual disputes
        that must be resolved at trial, or if there is no genuine dispute about

9          the inappropriateness of qualified immunity, a <u>Forsyth</u> appeal
        should be certified as frivolous... [O]r if there is a dispute about the

10          actions of the [defendants] and the disputes go the  [sic]
        <u>reasonableness</u> of the actions, that appeal should be deemed

11          frivolous...

12  <u>Dickerson</u>, 844 F. Supp. at 395. (emphasis added).  Once again, under this standard, it is not the

13  qualified immunity defense itself which is frivolous, but rather only the claim that a defendant is

14  immune from liability <u>as a matter of law</u>.

15        As the Court noted, the defendants' argument regarding the reasonableness of their conduct

16  was predicated on the "historical context" at the time of the experiments.  But even in such context,

17  given knowledge of the uniformly condemned Nazi prisoner experiments, one cannot argue that using

18  inmates as guinea pigs was reasonably believed at that time to be legal <u>as a matter of law</u>, as all courts

19  that have addressed this issue have squarely held.  Nor can one argue that using <u>any person</u> in such

20  experiments, in the absence of informed consent, was reasonably believed to be legal <u>as a matter of</u>

21  <u>law</u>.  In this case, as this Court has held, the record contains ample evidence from which a jury could

22  find fraud on the part of the defendants in convincing the plaintiffs to "volunteer."  Accordingly, on

23  this record, no summary judgment in favor of the defendants on this issue could be granted.  Indeed,

24  as the Court noted, the record would require "substantial development" before the defendants could

25  prevail on this issue even at trial.  SJ Order at 25.  As the defendants are limited to the existing record

26  for purposes of this appeal, the appeal is frivolous.

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 8

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

### D.    Policy Considerations Favor Plaintiffs.

2    Given the lack of substantive merit of defendants' appeal, their motive in pursing it becomes

3    clear: to further delay trial on the merits.  Such frivolous appeals seriously injure plaintiffs, because

4    "[d]uring the appeal memories fade, attorneys' meters tick, judges' schedules become chaotic (to the

5    detriment of litigants in other cases)."  Furthermore, "[m]ost deferments will be unnecessary.  The

6    majority of Forsyth appeals -- like the bulk of all appeals -- end in affirmance."  Apostol, 870 F.2d at

7    1338.  The Johnson court made similar admonishments about the dangers of delaying justice, which

8    concerns are readily apparent here.  Johnson, 515 U.S. at 315.  The plaintiffs in this case are no

9    longer young men.  They have, in general, had difficult lives, and many are in poor health.  Indeed,

10   two plaintiffs have died since the case was filed.  Affidavit of Keith D. Petrak in Support of Motion to

11   Certify Appeal as Frivolous, ¶ 2.

12   Justice has been delayed long enough.  Defendants fraudulently denied plaintiffs access to

13   critical facts about the nature of the experiments being performed on their bodies, which give rise to

14   this lawsuit, for more than thirty years.  Now, defendants seek to further delay trial in a case that is

15   already two and one half years old.  Courts must not sit idly by as a frivolous appeal goes up, but

16   rather should certify the appeal as frivolous, to get on with the trial.  Apostol, 870 F.2d at 1339.  So

17   should this Court.

18

### IV.  CONCLUSION

19   For the foregoing reasons, this Court should certify defendants' qualified immunity appeal as

20   frivolous, retain concurrent jurisdiction with the Ninth Circuit Court of Appeals, and convene a status

21   conference to determine a trial date and other relevant deadlines at the earliest possible date.

22   DATED this ____ day of March, 1999.

23                                                    BERGER AND MONTAGUE, P.C.
                                                     Daniel Berger
24                                                   Kendall S. Zylstra
                                                     Neil F. Mara
25                                                   1622 Locust Street
                                                     Philadelphia, PA  19103-6365
26

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

3      BYRNES & KELLER LLP
       Bradley S. Keller, WSBA #10665
       Keith D. Petrak, WSBA #19159
4      Jessica J. Fleck, WSBA #26490
       1000 Second Avenue, 38th Floor
5      Seattle, WA  98104
       (206) 622-2000
6

7

       By _____
8          Bradley S. Keller, WSBA #10665
           Keith D. Petrak, WSBA #19159
9          Jessica J. Fleck, WSBA #26490
       Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 10

1

## CERTIFICATE OF SERVICE

2

3      The undersigned hereby certifies that on March 16, 1999, a copy of the foregoing pleading was served upon the following individuals:

4      Via Hand Delivery:

5      Michael Madden                          James R. Shively
       Bennett & Bigelow, P.S.                  Assistant U.S. Attorney
6      999 Third Avenue, #2150                  920 W. Riverside, Ste. 300
       Seattle, WA  98104                       Spokane, WA   94210
7
       William R. Squires III                   Patricia H. Wagner
8      The Summit Law Group                     Heller, Ehrman, White & McAuliffe
       1205 Westlake Avenue N., Ste. 300        6100 Columbia Center
9      Seattle, WA   98109                      701 Fifth Avenue
                                                Seattle, WA  98104-7098
10
       John D. Wilson, Jr.
11     David M. Jacobi
       Wilson, Smith, Cochran & Dickerson
12     1700 Financial Center
       1215 Fourth Avenue
13     Seattle, WA  98161-1007

14
       Via Federal Express:
15
       Richard Montague                         Ms. Gay Elizabeth Kang
16     Trial Attorney                           Environmental Torts Section
       Torts Branch, Civil Division             Civil Division, Torts Branch
17     U.S. Department of Justice               P. O. Box 340
       1425 New York Ave. N.W., Room 8126       Washington, D.C.  20044
18     Washington, D.C.  20005

19

20

21

22

23

24

25

26

MEMORANDUM IN SUPPORT OF MOTION TO
CERTIFY APPEAL AS FRIVOLOUS - 11

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

*EXHIBIT A*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

FILED IN THE
U S DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAN 20 1999

JAMES R LARSEN, CLERK
_____ DEPUTY

Robert E. White et al.,    )
    )   No.   CS-97-239-RHW
    )
    Plaintiff(s),    )   **JUDGMENT IN A CIVIL CASE**
    )
    vs.    )
    )
C. Alvin Paulsen et al.,    )
    )
    )
    Defendant(s).    )
    )

This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that Judgment is entered in favor of the United States on Plaintiff's FTCA claim. FRCP 54(b).

DATED: January 20, 1999

JAMES R. LARSEN, CLERK

by _Kelly Howard_____
Kelly Howard, Deputy Clerk

RECEIVED

JAN 22 1999

BYRNES & KELLER
LLP

FILED IN THE
U S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAN 20 1999

JAMES R LARSEN, CLERK
_____ DEPUTY

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

ROBERT E. WHITE et al.,

    Plaintiffs,

    v.

C. ALVIN PAULSEN et al.,

    Defendants.

NO.  CS-97-239-RHW

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS**

Before the Court are the Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Ct. Rec. 178); Defendant Conte's Motion for Summary Judgment re: Statute of Limitations (Ct. Rec. 180), which is joined in by all remaining Defendants, other than the United States and Defendants Totter and Liverman; the State Defendants' Motion for Partial Summary Judgment on State Law Claims (Ct. Rec. 182) and Motion for Partial Summary Judgment on Qualified Immunity (Ct. Rec. 184); Defendant Liverman's Motion for Summary Judgment on Statute of Limitations (Ct. Rec. 189) and Motion for Summary Judgment on Qualified Immunity (Ct. Rec. 191); and Plaintiff White's Motion for Leave to File Corrected Response (Ct. Rec. 202).  Plaintiffs are represented by Stanley Siegel, Daniel Berger, Merrill Davidoff, Eric Cramer, Kendall Zylstra, Neil Mara, and Bradley Keller.  Defendant Paulsen is represented by John Wilson and David Jacobi; Defendant Battelle Pacific Northwest  Laboratories by William Squires; Defendants Totter and Liverman by Christopher Pickrell and Richard Montague; Defendant General  Electric by Patricia Wagner; and Defendants Rhay and Conte by Michael Madden.  These matters were argued on December 11, 1998.

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 1**

## BACKGROUND

Between 1963 and 1971, the University of Washington ["UW"] conducted experiments in which volunteer inmates at the Washington State Penitentiary ["WSP"] were subjected to ionizing radiation of their testes to determine effects. The inquiry was headed by Dr. Alvin Paulsen, a member of the UW faculty. UW was operating under contract to the United States Atomic Energy Commission ["AEC"]. **Ct. Rec. 181, Ex. E.**

In announcing the need for volunteers, WSP advised that temporary, or even permanent, sterility was a possibility. *Id.*, **Ex. G.** The consent form each Plaintiff signed was more explicit, and advised that permanent sterility was foreordained because a vasectomy would be performed at the conclusion of testing. *Id.*, **Exs. H-I.** The consent form also cautioned that "this is a scientific experimentation and its consequences cannot be entirely known." *Id.* More than 60 inmates participated during the eight-year investigation. Each received a single dose of radiation ranging from 7.5 to 400 rads. **Ct. Rec. 199, Ex. 72.** The dose was both preceded by and followed by biopsies of the testes to determine effects on sperm production. All of the named Plaintiffs sustained unpleasant effects, ranging from "normal discomfort" to episodic testicular burning and swelling. **Ct. Rec. 181, Ex. J.** At least some testicular pain was common to virtually all participants. The program started to wind down in 1969 after a number of media reports characterized it as "barbaric," and analogized to experiments performed in the Nazi death camps. *Id.*, **Exs. 1-55.**

On July 25, 1969, the Research Director of the Washington Department of Institutions [DOI] (now Department of Corrections), directed a letter to UW expressing reservations about the Paulsen study, and questioning whether WSP should have ever gotten involved. **Ct. Rec. 199, Ex. 74.** The letter closed with the query "if medical students at the University of Washington were asked to volunteer for this experiment and did so, would you let them?" On March 13, 1970, DOI's Research Review Committee

**ORDER GRANTING,** *INTER ALIA,* **GOVERNMENT'S MOTION TO DISMISS ~ 2**

1  expressed grave concern about the ethics of the study, calling into doubt whether an
2  incarcerated person was capable of giving informed consent. *Id.*, **Ex. 73**. It seems to be
3  agreed by all that Plaintiffs were motivated by the money offered by Paulsen, and
4  secondarily by his promise to put in a good word for them when their parole hearings
5  came up. The project was terminated shortly thereafter.

6      Skipping forward 23 years, on December 7, 1993, Secretary Hazel O'Leary of the
7  Department of Energy ["DOE"] held a press conference in which she disclosed the
8  agency's role in conducting radiation experiments on humans. **Ct. Rec. 199, Ex. 85.**
9  With the end of the cold war and the advent of a new era in international relations, DOE
10 had determined that it was time to be more open about such matters as well as other
11 nuclear-related information not affecting national security. O'Leary promised a massive
12 declassification program. She did not specifically refer to the Paulsen project, but
13 disclosed that perhaps as many as 800 human radiation experiments had been performed.
14 She expressed shock upon learning of these studies, and felt there ought to be some way
15 for the subjects of the experiments to be made whole. In response to a reporter's
16 question, she stated "Will we be sued? . . . we'll take it as it comes." *Id.*

17     Plaintiffs interpret her statements as holding out hope for voluntary governmental
18 compensation, but that is not a fair reading.[1] What O'Leary did do with her comments
19 about the victims being made whole, about the possibility of suit, and about the
20 repressive information policies that had historically characterized her agency and its
21 predecessor, was to virtually invite litigation.

22     Shortly thereafter, DOE opened a telephone hotline so that the subjects of the
23 experiments could report their status. Some of the Plaintiffs took advantage of the offer
24 and used the hotline in the belief that O'Leary was talking about them. Also shortly
25 thereafter, President Clinton directed agencies involved with human radiation

26 ───────────────

27     [1]O'Leary's call for compensation came not from her press conference, but from a
28 CNN program on which she appeared. **Ct. Rec. 199, Ex. 84 at 67.**

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO DISMISS ~ 3**

1  experimentation to take measures to identify and preserve all materials relevant to the
2  experiments and their subjects. *Id.*, **Ex. 86.**

3      These consolidated suits followed. Plaintiffs report a panoply of maladies ranging
4  from none other than fear of cancer, to sexual dysfunction, to debilitating bowel and
5  bladder problems, to precancerous conditions.

6  DISCUSSION

7      The motions will be grouped according to subject matter where appropriate so as
8  to avoid duplicative effort. Several points bear noting at the outset. First, the case relied
9  upon most heavily by all defendants is now before the Ninth Circuit. *Bibeau v. Pacific*
10 *Northwest Research Found.*, 980 F. Supp. 349 (D. Or. 1997), *appeal pending.*[2] For
11 reasons to be addressed further, the Court declines to endorse *Bibeau*'s categorical
12 approach. Second, much of the briefing is written as though this were a class action. It
13 is a putative class action, but has not been certified pursuant to Rule 23(c). There has
14 been no determination that the proposed representatives, in fact, satisfy the typicality and
15 adequacy requirements.

16 **A. Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction**[3]
17     Filing an administrative claim within 2 years of the accrual of a cause of action is a
18 jurisdictional requisite under the Federal Tort Claims Act ["FTCA"]. 28 U.S.C.
19 § 2675(a). The Court previously held that White's letter to DOE dated August 26, 1996
20 constituted a claim. Order entered March 17, 1998 at 4. **Ct. Rec. 168.** The letter
21 arguably failed to state a sum certain, but extending the content a liberal reading, the
22 Court found that White placed at least a $5,000,000 price tag on his injuries.

23 ———————————

24     [2]*Bibeau* was argued on September 15, 1998 and is now under submission.
25     [3]The motion is directed to White and to the 15 "new" Plaintiffs. McClellan's
26 FTCA claim was previously dismissed (Order entered March 17, 1998), and Plaintiffs
27 in the trailing case (CS-95-573-RHW) did not name the Government or any of its
28 employees as Defendants.

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO
DISMISS ~ 4**

The remaining question is accrual.  White had substantial contact with physicians both during incarceration and after his release in 1968 in which he presented complaints relating to his testes and scrotal area.  He knew in 1972 that he was permanently sterile.  **Ct. Rec. 199, Ex. 1 at 248-49.**  However, there is no need to consider what White knew or should have known over the course of these many years, or why he waited until 1994 to ask a physician directly whether there might be a causal connection between the irradiation and his complaints, because it is abundantly clear from White's letter of January 11, 1994 to DOE that he made the connection between the radiation experiments and his medical conditions:

> Dear Secretary O'Leary:
>
> I am one of 60 radiation/nuclear guinea pigs exposed to x-ray radiation testing during the 1960's while I was an inmate at the Walla Walla state prison facility.  I was exposed to a dose level of 400 rads.  Dr. Alvin C. Paulsen was the doctor in charge of the Atomic Energy Commission/ University of Washington joint project.
>
> I am worried about longterm effects on my health and life.  This worry is ever present in my thoughts and interferes with my enjoyment of life.  I am now, and for some time have been, feeling pain and discomfort in the area of exposure, i.e., genitals and surrounding soft tissue.

**Ct. Rec. 156, Exhibit A.**

That ends the inquiry.  *United States v. Kubrick*, 444 U.S. 111, 119-22 (1979) (claim accrues when claimant knows of injury and cause).  White all but concedes that his claim accrued in January 1994.  Plaintiffs' Response at 118 n.60 **(Ct. Rec. 205).**

Plaintiffs argue that equity should play a role, citing *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95-96 (1990) (equitable tolling and estoppel apply to suits against United States).  According to Plaintiffs, the Government knew of their potential claim, told them of their potential claim through the O'Leary press conference, set up a telephone hotline for victims to call, and responded to victims when they did call.  The essential purposes behind the claim requirement are notice to the Government of an injury and notice of the amount sought in damages.  According to Plaintiffs, if the Government is already aware of an injury, a claim serves no useful function.

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 5**

1    The position has some attraction, but *Irwin* held that the *same* tolling principles
2    that govern private actions apply to actions against the Government. 498 U.S. at 95-96.
3    Under Plaintiffs' theory, a negligent driver could strike another vehicle, kill the
4    occupants, know he was at fault, and expect to be sued. Because of his knowledge of
5    fault and exposure, he would remain subject to suit into infinity. That is not the law.
6    The driver would have to do something inequitable to the decedents' survivors to toll the
7    statute; something that would reasonably lull them into believing the statute was being
8    waived, or otherwise giving assurances that action need not be taken. *Millay v. Cam*,
9    135 Wash. 2d 193, 206 (1998) ("The predicates for equitable tolling are bad faith,
10   deception, or false assurances by the defendant and the exercise of diligence by the
11   plaintiff"). The simple fact is that White was aware of injury and causation on January
12   11, 1994. Because he was so aware, the cause of action had accrued. *Kubrick, supra*,
13   444 U.S. at 119-22. He perfected his claim on August 26, 1996. Nothing the
14   Government did during the intervening 2 ½ years prejudiced him, or dissuaded him from
15   pursuing his own investigation, or turning the matter over to counsel. *See Goodhand v.*
16   *United States*, 40 F.3d 209, 213 (7th Cir. 1994). Equitable tolling during this period is
17   unavailable because nothing the Government did during this time frame was inequitable.
18          Plaintiffs point to the hotline and assert that this may be deemed an alternative
19   mode of filing a claim. Unfortunately for Plaintiffs, the Court has previously rejected this
20   argument with respect to Plaintiff McClellan.

21          Neither the Amended Complaint nor Plaintiffs' response to the United
22   States' motion provide any indication that McClellan has filed a written
     claim with DOE regarding his alleged injuries. Instead, McClellan contends
     he provided DOE with sufficient notice of his claim by calling a telephonic
23   hotline set up by DOE in 1993 after then DOE Secretary O'Leary publicly
     announced the existence of government sponsored radiation experiments
24   like those at issue in this action. This was insufficient to present this claim
     to DOE for settlement because it has long been established that § 2675
25   claims must be presented in writing. *Warren*, 724 F.2d at 780; *see also* 28
     U.S.C. § 2401(b) (barring claims unless first presented "in writing" to
26   appropriate agency).

27

28

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 6**

1  Order entered March 17, 1998 at 4. **Ct. Rec. 168.**[4]

2      It could be argued, and Plaintiffs do, that holding out the bait of possible

3  compensation would reasonably lull the listener into believing that the money was on its

4  way. Initially, perhaps, but when 2 years passed with only empty hints of compensation,

5  continuing to hold out the bait would have an opposite effect on a reasonable person. He

6  would know by then that he had best pursue his own claim, because the Government was

7  not going to carry through voluntarily.

8      Finally, there is room to question whether *Irwin*'s broad statement survives *United*

9  *States v. Beggerly*, 118 S. Ct. 1862 (1998). *Beggerly* held that when a statute already

10  provides a "knew or should have known" accrual standard, further equitable tolling is not

11  available because the doctrine is built into the discovery rule. *Id.* at 1868. There is no

12  federal statutory accrual rule in this case, but once an action has been found appropriate

13  for application of the discovery rule, the same principle applies.[5] *See Kubrick, supra,*

14  444 U.S. at 120 n.7 (discussing "knew or should have known standard").

15      As to the 15 Plaintiffs who were allowed to join in the action by Order of

16  November 6, 1997 (**Ct. Rec. 148**), they did not file an administrative claim until May 26,

17  1998. **Ct. Rec. 181, Ex. 5, Attachment A.** That was almost 7 months after they were

18  allowed to join as Plaintiffs, and more than 8 months after the United States substituted

19  for its former AEC employees, Totter and Liverman, pursuant to 28 U.S.C. § 2179(d)(1).

20  **Ct. Rec. 107.** This is not permitted. A claim must be filed *before* an action is

21  commenced. *McNeil v. United States*, 508 U.S. 106, 111-13 (1993); *Crowley Marine*

22

---

23      [4]This ruling is not, as the Government argues, collateral estoppel, but it is the law

24  of the case.

25      [5]*Beggerly* was also influenced by the "unusually generous" 12-year period

26  provided by the statute at issue, and by the desirability of ensuring that landowners

27  know where they stand on their property rights. 118 S. Ct. at 1868. Neither feature is

28  present here.

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO
DISMISS ~ 7**

1 *Servs., Inc. v. Fednav Ltd.*, 924 F. Supp. 1030, 1035 (E.D. Wash. 1995). The same rule
2 applies even when the United States substitutes for named defendants, as it did in this
3 case. *Sullivan v. United States*, 21 F.3d 198, 206 (7th Cir. 1994).[6] This Court does not
4 now have subject matter jurisdiction with respect to the "new" Plaintiffs' claims against
5 the United States, and never did.

6      Plaintiffs counter that the Class Action Complaint was itself sufficient to constitute
7 a "claim." The position is flawed for several reasons. First, White is not a class
8 representative. He may never be. He is a proposed representative of a putative class that
9 has not yet been certified pursuant to Rule 23(c), and may never be. The notice imparted
10 by White did not impart notice on behalf of members of the uncertified class. Second,
11 the "claim" was not made to the agency. The agency is not even named. Third, the
12 "claim" is not for a sum certain.

13      Plaintiffs contend this is an idle exercise because 6 months have now run since the
14 administrative claims were filed, and the 15 newcomers have now exhausted. They urge
15 that all they need do is move to rejoin, or commence a new action. There is a body of
16 case law holding that rejoining will not work because a claim must be administratively
17 exhausted at the time the action is commenced. *Sparrow v. United States Postal Serv.*,
18 825 F. Supp. 252, 254-55 (E.D. Cal. 1993). If Plaintiffs take this approach, the
19 Government will wait until the 6-month statute of limitations runs, and move to dismiss
20 again. 28 U.S.C. § 2401(b). Plaintiffs can commence a new action, but instead of
21 relying on exhaustion of the May 26, 1998 claims, they might be better off seeking to
22 apply 28 U.S.C. § 2679(d)(5) to argue an earlier filing date on the claim.

23 _____

24     [6]This rule obviously raises timeliness issues, but Congress provided for that.
25 When the United States enters a substitution, and a plaintiff must file an administrative
26 claim, the claim will be deemed timely if: (1) the claim would have been timely if filed
27 on the date the suit was commenced; and (2) the claim is presented to the proper agency
28 within 60 days after dismissal of the civil action. 28 U.S.C. § 2679(d)(5).

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 8**

1   **B. Conte's Motion for Summary Judgment re: Statute of Limitations (Ct.**
2   **Rec. 180) (joined in by all Defendants except Totter, Liverman, and the**
3   **Government); Totter and Livermans's Motion for Summary Judgment on Statute**
4   **of Limitations (Ct. Rec. 189)**

5       These motions seek to dispose of the federal civil rights claims and all state claims
6   on limitations grounds.  The motions may be treated together because Washington law
7   and federal common law parallel one another on accrual issues.[7]  With respect to the
8   state claims, state law provides the entire answer.  *General Bedding Corp. v.*
9   *Echevarria,* 947 F.2d 1395, 1397 n.2 (9th Cir. 1991).  With respect to the federal claims,
10  state law provides only the relevant statute.  Federal law determines when accrual
11  occurs.  *Williams v. UNUM Life Ins. Co. of America,* 113 F.3d 1108, 1111(9th Cir.
12  1997).  As indicated, there is no conflict in any event.  The following principles govern.

13  **1. Rules of accrual**

14      When a federal cause of action does not contain its own statute of limitations,
15  courts borrow the most analogous state limitations period.  *Wilson v. Garcia,* 471 U.S.
16  261, 266-68 (1985).  In a civil rights case, that is the personal injury statute.  *Id.* at 275.
17  In Washington, the period is three years.  RCW § 4.16.080(2).  *Rose v. Rinaldi,* 654
18  F.2d 546, 547 (9th Cir. 1981).  The same principles apply to the judicially-created *Bivens*
19  action.  *Van Strum v. Lawn,* 940 F.2d 406, 408-10 (9th Cir. 1991).  As to the state

20  _____

21      [7]For reasons to be addressed further, reference to Washington law may be
22  superfluous to some extent because just as Plaintiffs failed to comply with federal
23  exhaustion requirements, so they failed to comply with state exhaustion requirements.
24  Be that as it may, the statute of limitations issues are in the case, and will be addressed
25  despite the fact that the state law claims asserted against state officials may become
26  irrelevant due to the mode of disposition.  Moreover, the limitations issues remain
27  relevant so far as GE and Battelle are concerned, neither of whom are covered by the
28  exhaustion requirement.

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO**
**DISMISS ~ 9**

claims, the same personal injury statute applies to all causes of action asserted, save for the battery claim which is governed by the 2-year statute. RCW § 4.16.100.

A cause of action presumptively accrues when the injury occurs. *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984); *accord, Williams, supra,* 113 F.3d at 1111; *Estates of Hibbard*, 118 Wash. 2d 737, 744 (1992). When causation is hazy, the general rule is modified to require knowledge of the injury and its immediate cause. *Dyniewicz, supra*, 742 F.2d at 486; *Hibbard, supra*, 118 Wash. 2d at 744. Known as the "discovery" or "due diligence" rule, there is some flexibility in cases where an injury or its cause is unknown and unknowable through reasonable diligence. *See In re Swine Flu Prod. Liability Litig.*, 764 F.2d 637, 639-40 (9th Cir. 1985); *White v. Johns-Manville*, 103 Wash. 2d 344, 354-56 (1985). The focus is on facts going to the presence of an injury and its relationship to an act, rather than on whether a theory of recovery exists. *Herrera-Diaz v. United States Dept. of Navy*, 845 F.2d 1534, 1536 (9th Cir. 1988); *Allen v. State,* 118 Wash. 2d 753, 758 (1992); *Gevaart v. Metco Constr.*, 111 Wash. 2d 499, 502 (1988). The parties agree that the test is objective, and is based on what a reasonable person similarly situated would perceive, and what inquiries a reasonable person would make.

### 2. Fraudulent concealment

An exception to the general rules comes into play when the party sought to be held liable engages in fraudulent conduct preventing the victim from discovering his claim, despite the exercise of due diligence. *Federal Election Comm'n v. Wilson*, 104 F.3d 237, 241 (9th Cir. 1996); *Crisman v. Crisman*, 85 Wash. App. 15, 20-21 (1997). The presence of fraud may operate in two different manners. It may toll the limitations period after a claim has accrued, or it may operate to keep the claim from accruing because a victim is unable to uncover critical facts even applying due diligence. Plaintiffs are

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO DISMISS ~ 10**

1  proceeding on the latter theory.[8]

2      Every Plaintiff contends that Paulsen minimized the effects of radiation. Many
3  stated they were told it would be akin to having several chest x-rays. **Ct. Rec. 199, Ex.**
4  **1 at 71; Ex. 2 at 40; Ex. 4 at 53; Ex. 5 at 30, 89; Ex. 6 at 77; Ex. 9 at 73; Ex. 10 at**
5  **16, 148; Ex. 11 at 42, 83; Ex. 12 at 43-44.** The procedure was safe. *Id.*, **Ex. 3 at 102;**
6  **Ex. 6 at 78; Ex. 9 at 73.** "We received assurance after assurance after assurance that it
7  was totally safe." *Id.*, **Ex. 7 at 110.** There would be no lasting effects. *Id.*, **Ex. 1 at 85.**
8  The participants would receive about as much radiation as would an astronaut in circling
9  the globe. *Id.*, **Ex. 4 at 53.** The purpose of the experiment was to determine safe levels
10  of exposure for astronauts. *Id.*, **Ex. 5 at 75.**

11      These representations are at odds with Plaintiffs' understanding that they risked
12  mutation of their genes. They were aware that a vasectomy would be required to guard
13  against fathering deformed children. *Id.*, **Ex. 1 at 71-72; Ex. 9 at 80-81; Ex. 11 at 36.**
14  Summary judgment proceedings, however, are not the place to resolve such conflicts.
15  Plaintiffs have created genuine issues of material fact over whether Paulsen vastly
16  understated the magnitude of their exposure. According to Plaintiffs, White's 400 rad
17  dose is the equivalent of 60,000 chest x-rays.

18      Those are the initial misrepresentations complained of. Plaintiffs contend,
19  however, that an ensuing cover-up rendered it difficult, if not impossible, to develop the
20  critical facts they would need to know to ascertain their injury and its cause. They have
21  ample assistance from no less an authority than former-Secretary O'Leary.

22      Q. . . . Prior to December 7, 1993, the date of your press conference, could
23  Rob White have procured information from the Department of Energy sufficient to put him on notice that he had claims arising out of the Paulsen
24  experiments?

    A. I do not believe he could have.

27  [8]This latter theory is codified in Washington at RCW § 4.16.080(4) and is
28  applicable to Plaintiffs' state law claims.

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 11**

1  Ct. Rec. 199, Ex. 84 at 72.[9]

2      O'Leary's opinion was based in part on an entrenched policy at DOE of ignoring
3  or delaying FOIA requests. The average FOIA request required 1,000 days to process,
4  "some of them, running into 3,000 days." *Id.* at 42. Information that might be
5  embarrassing "was simply not made available." *Id.* "I might add that the department
6  had a culture of punishing people when it -- when they delivered bad information." *Id.*
7  By "bad information," O'Leary did not mean inaccurate information, but rather
8  information that might place the agency in a bad light.

9      Plaintiffs claim that the experience of Plaintiff Byers is illustrative of their dilemma
10 in discovering injury and causation. He went to a doctor and asked whether his 300 rad
11 dose could be responsible for his complaints. The doctor dismissed him out of hand,
12 stating that what Byers was telling him was not humanly possible. *Id.*, Ex. 15 at 103. In
13 the physician's view, Byers actually received .3 rad, or more likely .03 rad, but certainly
14 not 300 rads. *Id.*

15     **a. Liverman and Totter**

16     The federal defendants had no personal hands-on management role in the Paulsen
17 study, once underway. **Ct. Rec. 193.** AEC field representatives reviewed progress, but
18 the role of these upper level officials was only to approve funding. Liverman is in a
19 particularly favored position because he voted against the Heller project that is the
20 subject of *Bibeau, supra.* *Id.* Liverman did not believe in using humans in experiments
21 of this nature. This is consistent with his deposition testimony that "Human
22 experimentation for experimentation's sake is not any good." **Ct. Rec. 199, Ex. 55 at**
23 **72.** Liverman has no independent recollection of the Paulsen study, but is certain he

24 _____

25     [9]O'Leary was probably well within her area of expertise in providing this answer.
26 She goes a little beyond her area of expertise in opining that in her view, the inmates
27 participating in the Paulsen project were not capable of giving informed consent. **Ct.**
28 **Rec. 199, Ex. 84 at 57–58, 69.**

ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO
DISMISS ~ 12

1    would have voted against it for the same reason he voted against the Heller project. **Ct.**
2    **Rec. 193.** Both defendants have been deposed, and there is nothing in the record
3    refuting these assertions.

4         Even assuming that these Defendants "must have known something" as a result of
5    one or more briefing sessions, fraudulent concealment requires active, not passive,
6    concealment. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987).
7    Simply not "owning up" is insufficient. *Grimmett v. Brown*, 75 F.3d 506, 515 (9th Cir.
8    1996). The only way Plaintiffs can save the day with respect to these Defendants is by
9    resort to a conspiracy theory. The record fails to establish such a conspiracy with
10   respect to these Defendants. Unlike several other Defendants, they had no special
11   relationship with Plaintiffs that would impose a heightened duty, and they undertook no
12   affirmative action beyond initial authorization of the project. Defendants' motion is
13   granted.[10]

14       **b. Everyone else**

15        Plaintiffs make the argument throughout their briefing that Paulsen, Rhay, and
16   Conte stood in a fiducial relationship with Plaintiffs. It is difficult to think of a
17   nontreating medical researcher employing non-therapeutic techniques to human guinea
18   pigs as being in a fiducial setting. It is more difficult to see the warden/inmate
19   relationship as engendering the sort of trust and confidence that tends to characterize
20   fiducial relationships. Nonetheless, it appears that such may be the case, or at least,
21   issues of fact remain.

22       **i. Paulsen**

23        Paulsen believes he had exactly the same duty of obtaining informed consent as he

24   _____

25        [10]The *agency* did much more than fail to "own up." Former-Secretary O'Leary
26   felt the lack of cooperation in providing information to the public rose to the level of
27   repression, and that the practice was systemic. The issue, however, is what these two
28   *Bivens* Defendants did. On this record, it appears that at most, they did not "own up." he

**ORDER GRANTING,** *INTER ALIA,* **GOVERNMENT'S MOTION TO DISMISS ~ 13**

1  would were he treating a regular patient on the outside. He was not obtaining consent

2  forms to protect himself from legal liability, but because "My duty to the volunteer was

3  the same as my duty to a patient on the outside or anything else. I had to inform them."

4  **Ct. Rec. 199, Ex. 24 at 142.** Paulsen believed he had a physician/patient relationship

5  with the inmates while he was attending to their biopsies. *Id.* at **117.** At least one of the

6  Plaintiffs (Donovan) believed that Paulsen was his doctor. *Id.*, **Ex. 3 at 183.** Paulsen

7  believed that when White came to see him after being released from prison, it was in the

8  context of a physician/patient relationship. *Id.*, **Ex. 24 at 123.**

9      The significance of the physician/patient relationship is that the full panoply of

10  fiducial duties attaches. *Carson v. Fine*, 123 Wash. 2d 206, 218 (1994). The

11  significance of the fiducial relationship is that Paulsen would not be privileged to lay

12  back and say nothing. He would have to "own up." *Crisman, supra*, 85 Wash. App. at

13  22. Material issues of fact remain with respect to this Defendant's representations.

14      **ii. Prison officials**

15      More unusual is the theory that DOI Director Conte and WSP Superintendent

16  Rhay were fiduciaries, but relationships giving rise to special duties of care are not

17  confined to the typical attorney/client, trustee/beneficiary, patient/physician constructs.

18  A "special relationship" may arise when one party undertakes affirmative obligations

19  running to another; *e.g.*, innkeeper/guest, school/student, employer/employee,

20  hospital/patient, carrier/passenger, business establishment/customer. *Hutchins v. 1001*

21  *Fourth Ave. Assocs.*, 116 Wash. 2d 217, 227-28 (1991). These relationships are all

22  characterized by the common thread of being "protective in nature." *Id.* A "special

23  relationship exists between the actor and the other [when it] gives the other a right to

24  protection." *Petersen v. State*, 100 Wash. 2d 421, 426 (1983) (quoting with approval

25  Restatement (Second) of Torts § 315).

26      *Hutchins* does not address fiduciaries, but rather one's duty to protect others from

27  harm caused by third parties. A "special relationship" within the meaning of *Hutchins*

28

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 14**

1    does not concurrently implicate the full spectrum of fiduciary obligations, but the

2    decision's third-party-harm analysis is very much on point.  Given the duties imposed by

3    statute on prison officials, and the realities of prison life, it may not be unreasonable to

4    add warden/inmate to the list of special relationships.

5        ### iii. GE's Motion for Summary Judgment

6        GE advances its central argument for the first time in the reply.  Ordinarily, this

7    would not be fair because it avoids the adversarial process.  However, GE stands in a

8    posture of its own, and its position is a natural outgrowth of Plaintiffs' argument that

9    even innocent parties may be held accountable for fraud committed by others, provided

10   that agency or privity exists.  What Plaintiffs are really arguing, of course, is co-

11   conspirator liability.  The Court previously dismissed the state law fraud claim asserted

12   against GE for failure to allege the requisite elements with particularity.  The Court went

13   on to note that "This flaw in Plaintiffs' pleading is not remedied by Plaintiffs' allegations

14   that Defendant was involved in a conspiracy with other Defendants who engaged in

15   fraudulent conduct because Plaintiffs fail to allege sufficient facts to establish that an

16   object of this conspiracy was the commission of fraud."  Order entered March 4, 1998 at

17   2.  **Ct. Rec. 166.**  Plaintiffs were offered the opportunity to amend and did not do so.

18   This ruling, now the law of the case, has a spillover effect on the statute of limitations

19   issue.  If GE cannot be charged with fraud, or with conspiracy to commit fraud, then

20   neither can it be charged with fraudulent concealment of critical facts.  At the hearing,

21   the Court sua sponte invited Plaintiffs to file a sur-reply.  They have done so, and the

22   submission does not alter this conclusion.

23       ### iv. Battelle's Motion for Summary Judgment

24       Battelle, as successor to GE, attempts to bootstrap on to GE's argument.  The

25   distinguishing feature is that GE has the benefit of a prior order of dismissal, and Battelle

26   does not.  In essence, Battelle's argument is an original motion to dismiss for lack of

27   pleading particularity.  As with GE, the Court sua sponte invited Plaintiffs to respond,

28

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 15**

1  and they have done so.

2      The mechanical aspects of Battelle's participation are stated somewhat more

3  broadly in the Amended Complaint than are those directed to GE, but the section

4  addressing conspiracy treats the two entities precisely the same. **Ct. Rec. 25, ¶¶ 93-99.**

5  If neither fraud nor conspiracy to commit fraud has been stated with sufficient

6  particularity to meet pleading standards, then it would appear that Battelle is entitled to

7  the benefit of the GE ruling.

8      **3. The categorical approach (or, how could they not know?)**

9      With accrual issues settled, the next question is the validity of the categorical

10  approach taken by *Bibeau, supra.* If a court must look at each Plaintiff individually, his

11  particular circumstances, and the nature and severity of his medical complaints, much of

12  this case must go forward. With several exceptions, Defendants do not attempt to

13  particularize the Plaintiffs, but lump them together in arguing what "they" must have

14  known. The approach is not altogether meritless. For example, when the Three Mile

15  Island nuclear accident resulted in literally thousands of claims, the Third Circuit had

16  little difficulty concluding that the accident and the dangers of radiation were so well

17  entrenched in the public mind that no one could fail to appreciate the source of an injury

18  linked to radiation. *In re TMI*, 89 F.3d 1106, 1117-18 (3rd Cir. 1996). In like manner,

19  *Bibeau, supra,* held that the "plethora of information in the public domain regarding the

20  risks of radiation exposure, generally, and the Heller experiments, specifically" conveyed

21  notice to plaintiff as a matter of law. 980 F. Supp. at 355; *see also, Winters v. Diamond*

22  *Shamrock Chem. Co.,* 149 F.3d 387, 403-04 (5th Cir. 1998) (pervasive news accounts of

23  Agent Orange injuries imputed notice to public at large).

24      Defendants have identified 55 news articles addressing the Paulsen study,

25  published in both the local and national press between 1963 and 1987.[11] **Ct. Rec. 181,**

26  _____

27      [11]The Paulsen study was never "secret" in the sense that no one knew of its

28  existence. The fact of its existence was not classified. Hence, the large number of

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO DISMISS ~ 16**

1  ¶ **19 & Attachment, Exs. 1-55.** In March 1976, then-Governor Evans launched a well-

2  publicized probe into the practice of using prisoners as guinea pigs. *Id.*, **Exs. 15, 16, 18.**

3  Congress became involved, and in 1986 issued what is known as the "Markey Report," a

4  congressional report condemning the use of humans in 31 different radiation experiments.

5  *Id.*, **Ex, Q**. In November 1984, Peter Jennings' ABC World News Tonight ran an

6  expose on national television. *Id.*, **Ex. 32.** It is a wonder that anyone over the age of 12

7  from any walk of life could have avoided learning of the experiments, or learning of the

8  dangers associated with radiation. It goes beyond wonder to suppose that a former

9  inmate who actually participated in the trials and suffered residuals could have

10 successfully avoided coming into that knowledge.

11        Having said that much, research has not disclosed any Ninth Circuit decision

12 adopting the view that general public awareness is itself sufficient to constitute

13 constructive notice to every citizen. One decision has been found, which declined that

14 view. *Swine Flu, supra,* 764 F.2d 637. Swine flue vaccine proved to be more deadly

15 than the disease, and inoculations ceased abruptly amid widespread press coverage. The

16 regional press in the area of plaintiff's residence ran the story. *Id.* at 640. One might

17 think that a person who had just been inoculated less than a week before the story broke,

18 as plaintiff was, would naturally react to the news with anxiety, and would probably

19 relay her fears to her husband. The Court agreed that "general community awareness"

20 might be relevant to imputing individual knowledge, but absent reason to believe that the

21 victim's "immediate community" was exposed to publicity, the Court thought additional

22 fact-finding was necessary. *Id.* at 640-41.

23        Then too, Defendants have a factual problem with their contention that publicity

24 was so pervasive that no one could fail to be aware. A number of defense witnesses had

25 _____

26 news stories generated over the years. What Plaintiffs complain of is that although the

27 project was known to be in operation, no information was available that would

28 suggest they had been drawn into participation through fraudulent representations.

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO DISMISS ~ 17**

little or no awareness of the publicity either. Defendant Totter did not recall having ever read a newspaper account of the Paulsen study. **Ct. Rec. 199, Ex. 50 at 105-06.** He was not familiar with Congressman Markey's inquiry. *Id.* **at 118.** He was not aware of the 1976 Heller litigation in Oregon. *Id.*, **Ex. 78 at 139-40.** Defendant Liverman was not aware of newspaper articles covering the Paulsen project until 1995 when the President issued his directive in response to the O'Leary press conference that all relevant materials be gathered and preserved. *Id.*, **Ex. 55 at 69-70.** Defendant Battelle's Ronald Paul had not seen any news articles either. *Id.*, **Ex. 46 at 62.** Battelle's Kenneth Swinth had not seen any articles prior to the O'Leary press conference. *Id.*, **Ex. 31 at 94-95.** As to the Markey Report, Plaintiffs believe it was deliberately suppressed by DOE. So does former-Secretary O'Leary. *Id.*, **Ex. 84 at 66-67.** Plaintiffs believe the report is being misused today by DOE contractors embroiled in litigation of this nature. So does Congressman Markey. *Id.*, **Ex. 89.**

Given *Swine Flu*, the fact that defense witnesses with an interest in the matter were unaware of the publicity, and the general rule that the jury decides accrual questions (*Lundy v. Union Carbide Corp*, 695 F.2d 394, 397-98 (9th Cir. 1982)), questions of fact remain on the import of the publicity.

### 4. Individual approach

Summary judgment is arguably appropriate as to some Plaintiffs. Plaintiff Bryant, for instance, made the connection between the radiation and his testicular disorders as early as 1976, when he sought out Dr. Paulsen on his attorney's advice. **Ct. Rec. 181, Ex. M**. Dr. Paulsen did not confirm the connection and, in fact, implicitly denied there was any, but the point is that Plaintiff made the connection, stated an intention to seek out another medical opinion, and was there at the behest of his attorney. *Id.*

Plaintiff Stowell learned in the mid-1970's of similar litigation in Oregon. *Id.*, **Attachment (Stowell Dep. at 47)**. He sought out an attorney, but could not afford the $10,000 retainer fee requested. *Id.* **at 48-49.**

ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO
DISMISS ~ 18

1    Plaintiff Fraulini learned sometime in the late-1960's or early-1970's that he had a
2 potentially cancerous growth on one of his testes, but did not return to the doctor who
3 found it for fear of confirming that he did, in fact, have cancer. *Id.*, **Attachment**
4 **(Fraulini Dep. at 43-44)**. Fraulini was aware of news media accounts of the connection
5 between radiation and cancer. *Id.* **at 33, 55-57**. He later followed up by writing letters
6 in 1987 to the governor and to his congressman. *Id.*, **Ex. R**.

7    Plaintiff Shepherd made the connection. After describing a rash on his inner thighs
8 which developed 20 years earlier, he was asked whether he associated the rash with his
9 participation in the radiation experiment. *Id.*, **Attachment (Shepherd Dep. at 51)**.
10 "Yeah, I figured it could have something to do with it." *Id.* Asked to expand, he replied
11 "Well, the radiation probably damaged some kind of cells in there or something." *Id.*
12 He made this connection 20 years ago, but dismissed it when the rash finally disappeared
13 5 years ago. *Id.*

14    Beyond these four plaintiffs, Defendants do not meet their preliminary burden of
15 showing a lack of genuine issue of material fact. The one exception is the battery claim
16 which is governed by the 2-year statute. White was aware of his claim no later than
17 January 11, 1994, and this action was not commenced until December 6, 1996. As to the
18 other Plaintiffs, because Defendants have rested on their group theory, it is impossible to
19 say if their claims are time-barred. Some Plaintiffs claim not to have known of causation
20 until solicited for inclusion in this lawsuit.

21    Coming back to the four Plaintiffs who, arguably, are subject to summary
22 judgment, the question is close. The Court could grant the motion, and it would probably
23 be sustained on appeal. However, it will not be granted at this time for five reasons.

24    a. In pursuing their group theory, Defendants mention only Fraulini and Stowell.
25 Information pertaining to Bryant and Shepherd was developed by the Court in its
26 independent research. A ruling adverse to these two Plaintiffs would fall outside the
27 adversarial process.

28

**ORDER GRANTING,** *INTER ALIA,* **GOVERNMENT'S MOTION TO
DISMISS ~ 19**

b. Plaintiffs have powerful evidence of a deliberative, systemic coverup by DOE over the span of many years.

c. As late as 1976, Paulsen was still telling his patients "No problem." He had to have known that others, including DOI, saw very significant problems. That is why he was shut down 5 years earlier.

d. Whether Plaintiffs could have gone into the medical community and developed meaningful information is less than certain. Illustrative is Plaintiff Byers' experience when he disclosed his 300 rad dose, only to be told he was "crazy." According to the physician, it simply could not have happened.

e. This case is going forward, and the incremental cost of carrying these four Plaintiffs will be marginal. Denial will be without prejudice to bringing a renewed motion once this case ages.

In summary, defense motions on the statute of limitations issues will be: (1) granted as to the federal Defendants; (2) granted as to all Defendants on the battery claim asserted by White; and (3) denied in all other respects.

**C. State Defendants' Motion for Partial Summary Judgment on State Law Claims[12]**

There is a threshold issue that cannot be resolved on this record. Plaintiffs contend that because discovery was limited by stipulation to statute of limitations and qualified immunity issues, this motion is improper. Defendants do not address Plaintiffs' assertion that they are in breach of the stipulation. Because the stipulation is not cited, the Court cannot determine where the truth lies. Even if Plaintiffs are correct, it is difficult to see how they are prejudiced. This issue is not fact-driven, and merely presents legal questions as to what the undisputed facts mean.

Pursuant to RCW §§ 4.92.100-.110, claims against the state must be

---

[12]Defendants recognize that a state's nonclaim statute cannot bar the federal causes of action.

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 20**

1  administratively exhausted by filing with the Office of Risk Management prior to
2  bringing suit. While the statutes refer only to the state, "claims against the state" include
3  those arising out of the conduct of the state's officers, agents, and employees acting
4  within the scope of their duties. *See Hardesty v. Stenchever*, 82 Wash. App. 253, 260-
5  61 (1996). After 60 days have elapsed, the claimant may then commence an action. The
6  statute counsels that it is to be liberally construed when reviewing the content of a claim,
7  but Washington courts have strictly construed the procedural requirements. *See, e.g.,*
8  *Kleyer v. Harborview Med. Center*, 76 Wash. App. 542, 547-49 (1995) (filing claim
9  with affected agency insufficient; claim must be filed with Office of Risk Management in
10 Olympia); *see generally, Hardesty, supra*, 82 Wash. App. at 259 (arraying authorities).
11 A failure to wait the required 60 days is fatal to maintaining an action. *Schmitz v. State,*
12 68 Wash. App. 486, 489-91 (1993). This is so even if the complaint and summons is not
13 served until 60 days have elapsed. *Id.*
14      A claim was filed in this case. Defendants contend it is defective in the
15 following particulars: (1) it was filed with the Office of Risk Management the same day
16 this action was commenced; and (2) only White filed the claim, although he purported to
17 do so on behalf of the class. Plaintiffs counter that: (1) when suit was initially filed,
18 Defendants were named in only their individual capacities; and (2) Defendants were
19 acting outside the scope of their authority.
20      **1. Timeliness**
21      A claim filed the same day an action is commenced is untimely. *Schmitz, supra,*
22 68 Wash. App. at 489-91 (1993). The remedy is dismissal. *Id.*
23      **2. Filing on behalf of class**
24      Plaintiffs point to authority from other jurisdictions allowing this practice. This
25 authority is not persuasive to this Court in construing state law. The verification
26 requirement found in RCW § 4.92.100 counsels against allowing an individual to file on
27 behalf of others, at least unless he has authority and first-hand knowledge of the claims
28

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO
DISMISS ~ 21**

1    of the others. The issue is of little moment because even if White validly filed on behalf

2    of the class, all that means is that the entire class is out of compliance with the statutory

3    timing requirements.

### 3. Individual capacities

5    Plaintiffs initially filed against the state Defendants only in their individual

6    capacities, filing an administrative claim the same day.[13] After 60 days elapsed, they

7    amended the complaint to allege an official capacity claim as well. Individual versus

8    official capacity has almost mystical meaning in the federal system, particularly in civil

9    rights litigation. *See Hafer v. Melo*, 502 U.S. 21, 25-26 (1991). The distinction has less

10   significance in the state system. The critical inquiry for purposes of the nonclaim statute

11   is whether the actor is entitled to defense and indemnification from the state pursuant to

12   RCW §§ 4.92.070-.075. That is all the legislature was interested in when waiving

13   sovereign immunity.

14   Plaintiffs urge that RCW § 4.92.110 does not apply to a suit against a state

15   employee named in his individual capacity. *Jones v. University of Washington*, 62

16   Wash. App. 653, 664 (1991). If the state is not going to pay for the defense and any

17   resulting judgment, the state has no interest in an administrative claim. *See Hardesty,*

18   *supra*, 82 Wash. App. 253 at 261. However, the Court has no more authority to order

19   the State of Washington not to provide defense and indemnification than it would to

20   order to the contrary. It is mere pleading formality to tell the state that the claim is based

21   on dual capacities, but tell the Court that it is being made only against Defendants in their

22   individual capacities. It would gut the nonclaim scheme to construe this sort of pleading

23   so as to avoid the statute. It would also contravene the statutory mandate that "no action

---

25   [13]Which, interestingly enough, states: "each tortious act attributed in the Class

26   Action Complaint to a state agent and/or employee in his individual capacity was

27   committed by such person and such person's state employer in his and/or its official

28   capacity." **Ct. Rec. 189, Attachment.**

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 22**

1   shall be *commenced*" until 60 days have elapsed from the filing of an administrative

2   claim. RCW § 4.92.110. Plaintiffs' tact would not work under the FTCA. *Sparrow,*

3   *supra*, 825 F. Supp. at 254-55. There is no reason to believe the legislature intended that

4   it work under the state's analog to the FTCA.

5       This might be a different case if Plaintiffs disclaimed any interest in satisfying a

6   judgment from the state coffers. In that event, this would be a true "individual capacity"

7   action. *Jones, supra*, 62 Wash. App. at 664. As matters stand, however, the Court does

8   not understand that to be Plaintiffs' position. When a state waives its sovereign

9   immunity, it is a matter of no small import. When a state imposes minimal procedural

10  requirements as a condition precedent of waiving immunity, it is no great burden. The

11  Court is confident that the state courts would reject the argument of Plaintiffs as does this

12  Court.

13  **4. Scope of authority**

14      Plaintiffs allege repetitively in the Amended Complaint that Defendants did what

15  they did because of their position, but now claim they were off on a lark of their own

16  because of the intentional nature of the torts alleged. There is no question but that each

17  Defendant was acting within the scope of employment. Each was doing what he was

18  doing with the knowledge of supervisors and the blessing of the employing agency. Each

19  was able to do what he was doing only because of his position of employment.

20      In summary, the motion will be granted for failure to comply with Washington's

21  nonclaim statute. Dismissal of the state claims is without prejudice.

22  **D. State Defendants' Motion for Partial Summary Judgment on Qualified**

23  **Immunity (Ct. Rec. 184); Liverman's Motion for Summary Judgment on Qualified**

24  **Immunity (Ct. Rec. 191)[14]**

25  _____

26      [14]The motions are treated together because Washington State law and federal law

27  parallel one another on qualified immunity issues. Washington has more statutory

28  sources of immunity than does the federal system, but none are relevant here.

**ORDER GRANTING,** *INTER ALIA,* **GOVERNMENT'S MOTION TO DISMISS ~ 23**

These motions are significant, but the least important of those presented. Liverman's is overkill, given the ruling on his other summary judgment motion. As to the State Defendants' motion, having determined that issues of fraudulent concealment preclude summary judgment, qualified immunity cannot save Defendants because good faith and intentional fraud are mutually exclusive. *See by analogy, Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) ("Given the district court's determination that there is a triable issue as to deliberate indifference, the doctors were not entitled to summary judgment on the ground that they could reasonably have believed their conduct did not violate clearly-established law"); *see also, Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992). *But see, Osolinski v. Kane*, 92 F.3d 934, 937 (9th Cir. 1996). These decisions are Eighth Amendment cases, but the mutual exclusivity of good faith and subjective bad intent need not be so narrowly confined. An actor engaging in subjective bad conduct will generally be hard pressed to demonstrate that his acts were nonetheless objectively reasonable.

Three elements must be established to invoke qualified immunity: (1) the right asserted must be identified; (2) the right must have been clearly established when the wrongful acts occurred; and (3) a reasonable official could not have believed his acts were lawful. *Hamilton, supra*, 981 F.2d at 1066. The Washington approach is essentially identical. *Robinson v. City of Seattle*, 119 Wash. 2d 34, 64-66 (1992). Among the rights allegedly infringed was the right to be free from non-consensual medical experimentation that results in health risk and pain. *Stadt v. University of Rochester*, 921 F. Supp. 1023, 1027-28 (W.D. N.Y. 1996).[15] According to *Stadt*, that

---

[15]This is, of course, not the *Stadt* case, where plaintiff was injected with radioactive materials without her knowledge and then studied over the next 26 years. Plaintiffs here volunteered, knowing they would be subjected to irradiation, knowing they would face multiple biopsies, knowing that irradiation could produce mutant sperm, and knowing that this is why they would be required to undergo a vasectomy. However,

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO DISMISS ~ 24**

1  right was clearly established "well before 1946." *Id.*  The more difficult question is

2  whether a reasonable person in Defendants' position could have believed their actions to

3  be lawful.

4       According to Paulsen, there was no opposition in the United States to the use of

5  inmates as guinea pigs in 1963.  The only opposition he got from DOI personnel was

6  from Dr. Holliday, who was ultimately successful in shutting the project down.  The

7  events of the relevant time frame cannot be ignored.  In the not-too-far-gone past, the

8  United States stood on the brink of WW III while the Russians decided just how

9  important it was to have long range nuclear missiles on Cuban soil.  It was the cold war

10  at its chilliest, when assured mutual destruction appeared to be mankind's best bet for

11  continued survival.  In the interest of saving hundreds of millions of innocents around the

12  world, perhaps it is not surprising that the lives of those not so innocent might be deemed

13  a little cheaper.

14       Even in this historical context, it cannot be said as a matter of law that Defendants

15  enjoy qualified immunity based on this third prong.  It is not a matter of law at all, but of

16  moral perception.  The record will require substantial development to determine if what

17  was going through Defendants' minds at this time could have reasonably gone through

18  the minds of those similarly situated.[16]

19  _____

20  they also "knew" that their risks would be about the same as that created by "one or

21  two chest x-rays."  The distinction between *Stadt* and this case is a matter of degree (and

22  rather significant degree), but not substance.

23       [16]Plaintiffs contend the issue need not be decided at all with respect to Paulsen

24  because, as an independent contractor, he is not entitled to the defense of qualified

25  immunity, citing, *Richardson v. McKnight*, 521 U.S. 399 (1997).  Plaintiffs must know

26  something that did not find its way into the briefing.  Paulsen was not a DOI or WSP

27  employee, but he was employed by UW as a member of the faculty.  UW is an arm of

28  the state.

**ORDER GRANTING, *INTER ALIA,* GOVERNMENT'S MOTION TO
DISMISS ~ 25**

1  **E. White's Motion for Leave to File Corrected Response**

2  The motion is not opposed.

3  Accordingly, **IT IS HEREBY ORDERED**:

4  1. The Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction

5  (Ct. Rec. 178) is **GRANTED**. Dismissal as to White is with prejudice, and as to the 15

6  "new" defendants, without prejudice.

7  2. Defendant Conte's Motion for Summary Judgment re: Statute of Limitations

8  (Ct. Rec. 180) is **GRANTED** as to the battery claim asserted by White, and **DENIED** in

9  all other respects.

10  3. The State Defendants' Motion for Partial Summary Judgment on State Law

11  Claims (Ct. Rec. 182) is **GRANTED**. Dismissal is without prejudice.

12  4. The State Defendants' Motion for Partial Summary Judgment on Qualified

13  Immunity (Ct. Rec. 184) is **DENIED**.

14  5. Defendants Totter's and Liverman's Motion for Summary Judgment on Statute

15  of Limitations (Ct. Rec. 189) is **GRANTED**.

16  6. Defendants Totter's and  Liverman's Motion for Summary Judgment on

17  Qualified Immunity (Ct. Rec. 191) is **DENIED**.

18  7. Plaintiff White's Motion for Leave to File Corrected Response (Ct. Rec. 202)

19  is **GRANTED**.

20  8. There being no just reason for delay, the District Court Executive is directed to

21  enter Judgment in favor of the United States on Plaintiffs' FTCA claim.  FRCP 54(b).

22  9. Within 30 days from entry of this Order, the parties shall file a joint status

23  certificate addressing all points of interest in moving this matter toward a schedule.

24  **IT IS SO ORDERED.** The District Court Executive is hereby directed to enter

25  //

26  //

27  //

28

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO DISMISS ~ 26**

1    this order and to furnish copies to counsel.

2        **DATED** this _20_ day of January 1999.

3

4

5                        ROBERT H. WHALEY
                    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Q:\Civil\1997\white.massive.motions.order.wpd

**ORDER GRANTING, *INTER ALIA*, GOVERNMENT'S MOTION TO
DISMISS ~ 27**

*EXHIBIT B*

CIVIL APPEALS DOCKETING STATEMENT

DOCKET

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
CIVIL APPEALS DOCKETING STATEMENT

PLEASE TYPE OR PRINT. ATTACH ADDITIONAL PAGES IF NECESSARY.

| | | INTERNAL USE ONLY | |
|---|---|---|---|

FEB 17 1999

| TITLE IN FULL: see attached for full caption | DISTRICT EASTERN/WA JUDGE: JUDGE ROBERT WHALEY |
|---|---|

ROBERT E. WHITE, et al.,
                          Plaintiffs,
    vs.

DR. C. ALVIN PAULSEN, et al.,
                          Defendants.

DON BYERS, et al.,
                          Plaintiffs,
    vs.

C. ALVIN PAULSEN, M.D.,
                          Defendant.

| DATE COMPLAINT FILED: | DISTRICT COURT DOCKET NUMBER: CS-97-0239RHW CONSOLIDATED |
|---|---|

| DATE NOTICE OF APPEAL FILED: 2/19/99 | IS THIS A CROSS-APPEAL? ___ YES XX NO |
|---|---|

HAS THIS MATTER BEEN BEFORE THIS COURT PREVIOUSLY?
                                      ___ YES  XX NO
IF YES, STATE WHEN:

CASE NAME:

CITATION:                    DOCKET NUMBER:

CHECK AS MANY AS APPLY

| JURISDICTION | | DISTRICT COURT DISPOSITION | | |
|---|---|---|---|---|
| 1. FEDERAL | 2. APPELLATE | 1. STAGE OF PROCEEDINGS | 2. TYPE OF JUDGMENT/ ORDER APPEALED | 3. RELIEF |
| [X] FEDERAL QUESTION | [ ] FINAL DECISION OF DISTRICT COURT | [X] PRE-TRIAL | [ ] DEFAULT JUDGMENT | [ ] DAMAGES: |
| [ ] DIVERSITY | | [ ] DURING TRIAL | | AMOUNT SOUGHT: |
| [ ] OTHER (SPECIFY): | [X] INTERLOCUTORY DECISION APPEALABLE AS OF RIGHT | [ ] AFTER TRIAL | [ ] JUDGMENT/ COURT DECISION | _____ |
| | | | [ ] DISMISSAL/ JURISDICTION | |
| | [ ] INTERLOCUTORY ORDER CERTIFIED BY DISTRICT JUDGE (SPECIFY): | | [ ] JUDGMENT/ JURY VERDICT | [ ] AMOUNT GRANTED: _____ |
| | | | [ ] DISMISSAL/ MERITS | [ ] AMOUNT DENIED: _____ |
| | [ ] OTHER (SPECIFY): | | [X] SUMMARY JUDGMENT | [ ] INJUNCTIONS |
| | | | [ ] JUDGMENT NOV | [ ] PRELIMINARY OR [ ] PERMANENT |
| | | | [ ] DECLARATORY JUDGMENT | [ ] GRANTED OR |
| | | | [ ] DIRECTED VERDICT | [ ] DENIED |
| | | | [ ] OTHER (SPECIFY): | |

BRIEF DESCRIPTION OF NATURE OF ACTION AND RESULT BELOW:
See attached.

ISSUES PROPOSED TO BE RAISED ON APPEAL:
See attached.

**BASED ON YOUR PRESENT KNOWLEDGE:**

1. Does this appeal involve a question of first impression?
   ____ Yes    _X_ No

2. Will the determination of this appeal turn on the interpretation or application of a particular case or statute?
   ____ Yes    _X_ No   If yes, provide:

   Case name/status: _____
   _____

   Citation: _____

   Docket Number, if unreported: _____

3. Is there any case now pending or about to be filed in this court or any other court administrative agency which:

   a) Arises from substantially the same case or controversy as this appeal?
      ____ Yes    _X_ No

   b) Involves an issue that is substantially the same, similar or related to an issue in this appeal?
      ____ Yes    _X_ No

   Case name: _____

   Citation: _____

   Court or agency: _____

   Docket number, if unreported: _____

4. Will this appeal involve a conflict of law within the Ninth Circuit? ____ Yes   _X_ No
   Among circuits? ____ Yes   _X_ No
   If yes, explain briefly:
   _____
   _____
   _____
   _____

**DOES THIS APPEAL INVOLVE ANY OF THE FOLLOWING:**

____ Possibility of settlement;

____ Likelihood of a motion to expedite the appeal;

_X_ Multiple parties on either side for whom joint briefing is possible;

____ Likelihood of motions to intervene on appeal;

____ Likelihood of motions to file amicus briefs;

____ Likelihood of motions to stay appeal pending resolution of a related case. Identify case name, docket number and court or agency:
_____
_____
_____

____ Other procedural complexities:
_____
_____

**COUNSEL FOR APPELLANT(S):** Paulsen

NAME:  John D. Wilson, Jr.
       David M. Jacobi

FIRM:  Wilson Smith Cochran & Dickerson

ADDRESS: 1215 Fourth Ave., Suite 1700
         Seattle, WA  98161

TELEPHONE: (206)623-4100

I CERTIFY THAT A COPY OF THIS CIVIL APPEALS DOCKETING STATEMENT WAS SUBMITTED TO THE CLERK OF THE DISTRICT COURT OR THE CLERK OF THE U.S. COURT OF APPEALS, AND THAT IT WAS SERVED ON EACH PARTY/COUNSEL SHOWN ON THE ATTACHED SERVICE LIST.

SIGNATURE _____   DATE 2·17·99

REMEMBER TO ATTACH COPIES OF ORDER/JUDGMENT APPEALED FROM
AND SERVICE LIST WITH TELEPHONE NUMBERS

Adopted by the Ninth Circuit, July 1, 1992

Counsel for Appellants Rhay and Conte:
Michael F. Madden
Bennett Bigelow & Leedom
999 Third Avenue, Suite 2150
Seattle, WA  98104
(206)622-5511

THE HONORABLE ROBERT WHALEY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| ROBERT E. WHITE and TERESA JANE WHITE, and Their Marital Community, and CHARLES V. MCCLELLAN, JR., on Their Own Behalf and as Representatives of Classes of Similarly Situated Persons, | CONSOLIDATED CASE<br><br>NO.  CS-97-0239 RHW |

                                        Plaintiffs,

                    vs.

DR. C. ALVIN PAULSEN, in his individual and
former official capacity; BATTELLE PACIFIC
NORTHWEST LABORATORIES, a division of
BATTELLE MEMORIAL INSTITUTE, INC.,
an Ohio Corporation; THE BOARD OF
REGENTS OF AND THE UNIVERSITY OF
WASHINGTON; THE UNIVERSITY OF
WASHINGTON MEDICAL CENTER; DR.
JOHN RANDOLPH TOTTER, in his individual
capacity; DR. JAMES LESLIE LIVERMAN, in
his individual capacity; ROBERT J. RHAY, in
his individual and former official capacity;
GARRETT HEYNS, in his individual and
former official capacity; DR. WILLIAM J.
BREMNER, in his individual and former official
capacity; GENERAL ELECTRIC, CO.; DR.
WILLIAM CONTE, in his individual and
former official capacity; C.E. HEFFRON, in his
individual and former official capacity,

                                        Defendants.

DON BYERS. Airway Heights, Washington,
and DON KREITZ, Spokane, Washington

                                        Plaintiffs,

                    vs.

C. ALVIN PAULSEN, M.D., Seattle,
Washington,

                                        Defendant.

## ATTACHMENT TO
## CIVIL APPEALS DOCKETING STATEMENT
### White v. Paulsen, et al.
### United States District Court
### Eastern District of Washington
### Cause No. CS97-0239RHW

## Brief Description of Nature of Action and Result Below:

Plaintiffs assert claims under 42 U.S.C. §1983 for alleged constitutional violations in connection with a medical study in which they participated as human subjects. The appellants, who acted in their official capacity as employees of agencies of the State of Washington, moved for summary judgment based on their qualified immunity from suit. The trial court denied the motion.

## Issues to be Raised on Appeal:

Whether the trial court erroneously declined to hold that plaintiffs' claims are barred, as a matter of law, under the qualified immunity doctrine.

# SERVICE LIST
## White v. Paulsen, et al.
### United States District Court
### Eastern District of Washington
### Cause No. CS97-0239RHW

**Attorney for Plaintiff:**
Bradley S. Keller
Byrnes & Keller, LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206)622-2000

Kendall S. Zylstra
Daniel Berger
Merrill G. Davidoff
Stanley B. Siegel
Eric L. Cramer
Berger and Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
(215) 875-3000

**Attorney for Defendant Paulsen:**
John D. Wilson, Jr.
David M. Jacobi
Wilson Smith Cochran & Dickerson
1215 Fourth Avenue, Suite 1700
Seattle, WA 98161
(206)623-4100

**Attorney for Defendant Battelle Pacific
Northwest Laboratories, a division of
Battelle Memorial Institute, Inc.:**
William R. Squires, III
Summit Law Group
1505 Westlake Avenue North, Suite 300
Seattle, WA 98109
(206)281-9881

**Attorney for GE:**
Patricia H. Wagner,
Jonathan Palmer
Heller Ehrman White & McAuliffe
701 Fifth Avenue, Suite 6100
Seattle, WA  98104-7098
(206)447-0900

**Attorney for Robert J. Rhay and**
**William R. Conte, M.D. :**
Michael F. Madden
Bennett Bigelow & Leedom
999 Third Avenue, Suite 2150
Seattle, WA  98104
(206)622-5511

**Attorney for Totter & Liverman:**
Richard Montague
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 7146
Washington, D.C.  20044-7146
(202) 616-4158

**Attorney for United States:**
Gay Elizabeth Kang, Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 340
Washington DC  20044
202) 616-4218

RECEIVED

1  BERGER AND MONTAGUE, P.C. 12 AM '99        The Honorable Robert H. Whaley
   Daniel Berger        FEB 24
2  Kendall S. Zylstra
   Neil F. Mara
3  1622 Locust Street
   Philadelphia, PA  19103-6365

4  (215) 875-3000                                      FEB 24 1999

5  BYRNES & KELLER LLP                           JAMES A. LARSEN, CLERK
   Bradley S. Keller, WSBA #10665                              DEPUTY
6  Keith D. Petrak, WSBA #19159
   Jessica J. Fleck, WSBA #26490
7  1000 Second Avenue, 38th Fl.
   Seattle, WA  98104
8  (206) 622-2000

9
                    UNITED STATES DISTRICT COURT
10                  EASTERN DISTRICT OF WASHINGTON

11
   ROBERT E. WHITE, et al.,            )
12                                      )
                         Plaintiffs,    )    No. CS 97-0239 RHW
13                                      )
          v.                            )    JOINT STATUS REPORT
14                                      )
   DR. C. ALVIN PAULSEN, et al.,        )
15                                      )
                         Defendants.    )
16  _____ )
                                        )
17  DON BYERS, et al.,                  )
                                        )
18                       Plaintiffs,    )
          v.                            )
19                                      )
   C. ALVIN PAULSEN, M.D., et al.,      )
20                                      )
                         Defendants.    )
21  _____ )

22      The Plaintiffs and defendants Paulsen, Rhay and Conte ("Defendants"), through their

23  respective counsel, hereby submit the following joint status report.

24      1.    Status of Discovery and Estimated Completion Date.  Discovery regarding statute of

25  limitations and qualified immunity issues is complete.  Plaintiffs believe that discovery regarding

26

JOINT STATUS REPORT - 1

COPY

1  liability and damages issues is largely complete, except for discovery of expert witnesses, and that all

2  discovery can be completed in 90 days. Defendants believe that discovery regarding liability and

3  damages as to each of the plaintiffs will require no less than 180 days, and may include, in addition to

4  expert witness discovery, discovery from treating physicians and other health care providers, as well

5  as lay and expert discovery regarding the claims asserted by or on behalf of spouses and children of

6  study participants.

7       2.    Status of Pending Matters.  There are no motions presently pending before the court.

8  On or about February 18, 1999, Defendants filed and served a Notice of Appeal, which seeks review

9  of this Court's denial of Defendants' motions for summary judgment on the grounds of their qualified

10  immunity from suit.  Defendants take the position that, under Behrens v. Pelletier, 516 U.S. 299

11  (1996), Mitchell v. Forsyth, 472 U.S. 511 (1985) and Chuman v. Wright, 960 F.2d 104 (9th Cir.

12  1992), the Court's interlocutory ruling on qualified immunity is immediately appealable as of right.

13  Furthermore, Defendants contend that "the district court is automatically divested of jurisdiction to

14  proceed with trial pending appeal" of its qualified immunity ruling.  Chuman v. Wright, 960 F.2d at

15  105.  Defendants therefore will immediately seek a stay of all proceedings pending resolution of the

16  appeal.

17       3.    Joinder of Additional Claims or Parties.  Plaintiffs expect to file motions to amend

18  their complaint to renew their state tort claims  against the Defendants, and their claims against the

19  United States, which the court recently dismissed for failure to comply with the state and federal tort

20  claims acts.  Plaintiffs contend that, as these claims were part of the litigation throughout discovery

21  until the Court's recent order, the renewal of these claims will not prejudice the Defendants or require

22  additional discovery that will unnecessarily delay the litigation.  Defendants contend that because they

23  have filed notices of appeal regarding the ruling on qualified immunity, this court may not address the

24  addition of claims or parties until the appeal is resolved.

25       4.    Trial Date.  The parties believe that they can be ready for trial by 90 days after the

26  close of discovery.

JOINT STATUS REPORT - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    5.    Jury Demand.  The Plaintiffs have demanded a jury trial.

2    6.    Trial Length.  Plaintiffs estimate that trial will require fifteen (15) trial days.

3  Defendants believe that the jury will be asked, in one or more trials, to consider specific evidence and

4  required to resolve individual questions regarding the statute of limitations, liability and damages as to

5  each named plaintiff.  As a result, Defendants believe that trial of all of the Plaintiffs' claims will

6  require at least thirty (30) trial days.

7    7.    Legal Issues About Which Pretrial Motions Are Contemplated.

8        a.    Plaintiffs' Contemplated Motions.

9            1)    Class certification.

10            2)    Appropriate evidentiary motions.

11        b.    Defendants' Contemplated Motions.

12            1)    Appropriate evidentiary motions.

13            2)    In the event that Plaintiffs are permitted to amend their complaint to
                renew claims the Court has dismissed for failure to comply with state
14                and federal tort claims acts, Defendants may move for summary
                judgment dismissing those claims under applicable statutes of
15                limitations.

16    8.    Mediation.  The parties believe that this case is appropriate for designation as a

17  "mediation case" pursuant to LR 16.2.

18

19

20

21

22

23

24

25

26

JOINT STATUS REPORT - 3

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1       DATED this _____ day of February, 1999.

2 BERGER AND MONTAGUE, P.C.     WILSON, SMITH, COCHRAN &
  Daniel Berger                           DICKERSON

3   Kendall S. Zylstra                John D. Wilson, Jr., WSBA #4828
  Neil F. Mara                       David M. Jacobi, WSBA #13524

4   1622 Locust Street               1700 Financial Center
  Philadelphia, PA 19103-6365      1215 Fourth Avenue

5                                     Seattle, WA 98161-1007
  BYRNES & KELLER LLP

6   Bradley S. Keller, WSBA #10665
  Keith D. Petrak, WSBA #19159

7   Jessica J. Fleck, WSBA #26490      By _____ for David Jacobi
  1000 Second Avenue, 38th Floor     Attorneys for Defendants Paulsen,   per 2/22/99

8   Seattle, WA 98104              University of Washington and University   telephone
  (206) 622-2000                of Washington Medical Center   auth

9

10 By _____
  Attorneys for Plaintiffs

11

12

13 BENNETT & BIGELOW, P.S.
  Michael Madden, WSBA #8747

14   999 Third Avenue, #2150
  Seattle, WA 98104

15

16 By _____ for Mike Madden

17   Attorneys for Defendants Conte and Rhay  per 2/22/99
                                    telephone auth

18

19

20

21

22

23

24

25

26

JOINT STATUS REPORT - 4

1

## CERTIFICATE OF SERVICE

2      The undersigned hereby certifies that on February 22, 1999, a copy of the foregoing pleading

3   was served upon the following individuals:

4

5   Via Hand Delivery:

6   Michael Madden                          James R. Shively
    Bennett & Bigelow, P.S.                 Assistant U.S. Attorney
    999 Third Avenue, #2150                 920 W. Riverside, Ste. 300
7   Seattle, WA  98104                      Spokane, WA  94210

8   William R. Squires III                  Patricia H. Wagner
    The Summit Law Group                    Heller, Ehrman, White & McAuliffe
9   1205 Westlake Avenue N., Ste. 300       6100 Columbia Center
    Seattle, WA  98109                      701 Fifth Avenue
10                                          Seattle, WA  98104-7098

11  John D. Wilson, Jr.
    David M. Jacobi
12  Wilson, Smith, Cochran & Dickerson
    1700 Financial Center
13  1215 Fourth Avenue
    Seattle, WA  98161-1007
14

15  Via U.S. Mail:

16  Richard Montague                        Ms. Gay Elizabeth Kang
    Trial Attorney                          Environmental Torts Section
17  Torts Branch, Civil Division            Civil Division, Torts Branch
    U.S. Department of Justice              P. O. Box 340
18  1425 New York Ave. N.W., Room 8126      Washington, D.C.  20044
    Washington, D.C.  20005
19

20

21

22

23

24

25

26

JOINT STATUS REPORT - 5

BYRNES & KELLER L.L.P
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

*EXHIBIT D*

10/02/96   14:09   ☎503 687 6427        ROY HABER, P.C.                                    Ø003

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| HAROLD BIBEAU and MELANIE ANN DOOYEN BIBEAU on Their Own Behalf and as Representatives of Classes of Similarly Situated Persons, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 95-6410 |
| v. | ) ) ) | ORDER |
| PACIFIC NORTHWEST RESEARCH FOUNDATION, INC., a Washington Corporation; BATTELLE PACIFIC NORTHWEST LABORATORIES, a division of BATTELLE MEMORIAL INSTITUTE, INC., an Ohio Corporation; MAVIS ROWLEY; DR. DANIEL DIIACONI, in his individual and former official capacity; DR. FERNANDO LEON, in his individual and former official capacity; ROBERT D. WILDMAN, in his individual and former official capacity; DR. JOHN RANDOLPH TOTTER, in his individual and former official capacity; DR. JAMES LESLIE LIVERMAN, in his individual and former official capacity; ROBERT L. FERGUSON, in his individual and former official capacity; and JOHN/JANE DOE DEFENDANTS (1-n), in their | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

1 - ORDER

individual and offical capacities, )
                                   )
                Defendants.        )
                                   )

HOGAN, J.

I.    INTRODUCTION

        Plaintiffs, husband and wife, on their own behalf and
as representatives of a class of similarly situated persons,
claim that from 1963 to 1973 defendants conspired to
fraudulently induce prisoners in the custody of the Oregon
Department of Corrections (DOC) to volunteer for a program
of experiments (the "Heller experiments") testing the
effects of radiation exposure to the testes.  As part of the
experiments, the subjects' testes were irradiated with x-ray
radiation and injected with radioactive substances.
Participation in the experimen    _uired subjects to
undergo biopsies and to agree to a vasectomy as a condition
of participation.  Plaintiffs allege that the subjects were
not fully informed of all potential risks.  Plaintiffs
allege that although consent was given, it was not
sufficiently well-informed to be valid.  Plaintiffs also
allege that the subjects were induced to volunteer by
financial incentives which were so far in excess of the
prevailing wage in prison jobs available to them as to be
"coercive."  One named plaintiff, Mr. Bibeau, was an
experiment subject.  The experiments allegedly caused
physical and emotional harm.

2 - ORDER

The Heller experiments are named after the doctor who headed the program; he is now deceased.  Approximately 67 prisoners participated in the Heller experiments.  They were conducted pursuant to a contract between the Atomic Energy Commission (AEC) and defendant general contractor Pacific Northwest Research Foundation, Inc. (PNRF).  The experiments "appear to have been designed to investigate, *inter alia*, the long-term effects of radiation exposure on nuclear workers and on future pilots of a then-proposed nuclear-powered airplane."  Amended Complaint (A.C.), ¶ 1.

Plaintiffs allege that defendants engaged in a conspiracy to conceal the true nature of the experiments, thereby obstructing plaintiffs' access to the courts. Plaintiffs allege they did not know the true facts of the Heller experiments until

> [i]n or about December 1993, [when,] after decades of secrecy, silence, and denials, the United States government, through public disclosures made by the Department of Energy (the "DOE") and by DOE Secretary Hazel O'Leary ("O'Leary"), began to reveal some of the horrible details of the human radiation experiments conducted, funded and/or otherwise sponsored by the United States government during the Cold War through various predecessor agencies of the DOE, and in conjunction, collaboration and conspiracy with private medical institutions and, in some cases, state authorities.

A.C., ¶ 2.

The amended complaint names as defendants several doctors, corporations and corporate agents involved with the experiments, and lists ten claims for relief:

3 - ORDER

**FEDERAL CLAIMS**

1.    42 U.S.C. § 1983

      Fifth Amendment claims:

- substantive due process (right to bodily integrity)

- substantive due process (right of access to the courts)

- procedural due process (right of access to the courts)

      Fourth Amendment claims:

- unreasonable search and seizure

      Eighth Amendment claims:

- cruel and unusual punishment

2.    <u>Bivens</u> actions

      Same rights allegedly violated as in the section 1983 claims.

**STATE CLAIMS**

3.    Fraud

4.    Battery

5.    Intentional Infliction of Emotional Distress

6.    Strict Liability for Inherently Ultrahazardous Activities

7.    Negligence and Gross Negligence

8.    Loss of Consortium

9.    Breach of Fiduciary Duty

**OTHER**

10.    Civil Responsibility for Crimes Against Humanity

4 - ORDER

All defendants are named in each claim for relief
except for claim 9 (breach of fiduciary duty) which names
only some.

The complaint proposes three separate classes: Class I
consists of the inmate experiment subjects; Class II
consists of family members of experiment subjects; Class III
is the medical monitoring class--it consists of all those
natural children conceived by members of class I after they
were subjected to the Heller experiments.

Several defendants have moved to dismiss the amended
complaint.  There are five separate motions.

## II.   BATTELLE'S MOTIONS TO DISMISS (## 31, 68)

Battelle Memorial Institute, Inc. (Battelle) allegedly
provided equipment, facilities and technical advice, support
and review to Heller and his assistant and analyzed
specimens and samples obtained from the experiment subjects.
Battelle allegedly received funds over several years
pursuant to contract with the AEC to conduct the Heller
experiments.

Pursuant to Fed. R. Civ. P. 12(b)(6), Battelle asks
that all claims asserted against it (i.e. claims 1-8, 10) be
dismissed because they are barred by either the statute of
limitations or the statute of ultimate repose.

Alternatively, Battelle moves to dismiss (1) the
federal claims because plaintiffs have failed to allege
sufficient facts to support any claim against Battelle,

5 - ORDER

whose alleged role in the experiments was peripheral; (2)
plaintiffs' sixth claim for relief (ultrahazardous
activities), because the administration of X-Rays, by
itself, is not ultrahazardous; and (3) plaintiffs' tenth
claim for relief (crimes against humanity) for failure to
state a claim.

    A.    **FAILURE TO STATE A CLAIM AGAINST BATTELLE (Federal
        Claims)**

Since Battelle is a private actor, plaintiffs seek
to hold it liable under section 1983 and Bivens via its
status as a co-conspirator with the state and federal
actors.  Adickes v. S.H. Kress, 398 U.S. 144, 149 (1970)
(private parties jointly engaged with state actors in
prohibited actions are acting "under color of law").  To
make such a showing, a plaintiff must allege that defendant
was a "willful participant in joint activity with the State
or its agents." Id. at 152.

Battelle argues plaintiffs have not alleged facts
showing that Battelle was a participant in the conspiracy,
nor have they alleged facts that support any of their claims
against Battelle in the absence of a conspiracy.  Battelle
argues the complaint alleges only that Battelle provided
peripheral technical support for the experiments.

Plaintiffs' most detailed allegations concerning
Battelle's role are:

36.  Defendant Battelle participated in the

6 - ORDER

Heller Experiments in the following ways, without
limitation:  by calibrating the x-ray machinery
utilized in the Heller Experiments to irradiate
the victims' testes; by providing to Heller for
use in the Experiments various pieces of
scientific equipment, including an electron
microscope; by furnishing technical advice to
Heller, defendant Rowley and others involved in
the Experiments; by analyzing in its laboratories
various samples extracted from the victims; by
allowing Heller and Defendant Rowley to use its
laboratory facilities; and by reviewing of the
various proposals for modification of the Protocol
(as defined infra) submitted by Heller and
defendants Rowley and PNRF at the specific request
of the AEC.

A.C. ¶ 36.

Plaintiffs do not claim that Battelle played any role

in the Experiments themselves:

    82.   In designing and administering the
Experiments, Heller and defendant PNRF, as the
contractor for the AEC, were given wide latitude
by the AEC and the Bivens defendants and
discretion to develop the Protocol for the
Experiments, and conduct the Experiments.

    83.   The AEC delegated to Heller and
defendants PNRF and Rowley the authority, without
limitation: to solicit and select the victims, to
create "consent" forms, to determine the dosage,
timing, and quantity of exposure to x-rays
administered to the victims.

A.C. ¶¶ 82, 83.  Thus, Battelle argues, the complaint

alleges that the experiments were designed and conducted by

parties other than Battelle.

It is not necessary to show Battelle participated in

the day-to-day administration of the experiments, however.

Plaintiffs must merely allege involvement and facts from

which could be inferred a meeting of minds as to purpose.

7 - ORDER

United Steelworkers of America v. Phelps Dodge, 865 F.2d
1539, 1541 (9th Cir. 1989) ("each participant must at least
share the common objective of the conspiracy"). Still,
vague, conclusory allegations of conspiracy are insufficient
to withstand a motion to dismiss. Ivey v. Board of Regents
of Univ. of Alaska, 673 F.2d 266 (9th Cir. 1982). In Ivey,
the plaintiff claimed his university employment was
terminated because of his efforts to advance desegregation.
The complaint alleged, generally, that a local municipality
had provided funding and administration to the university,
and that the challenged racial segregation resulted from
illegal actions by all defendants. The court upheld the
municipality's dismissal, holding the allegations too
general, and unsupported by "reference to specific actions,
practices, or policies." Id. at 268.

Plaintiffs here have not alleged facts supporting
their allegations that Battelle was a co-conspirator. See
A.C., ¶¶ 127, 130-136. Because plaintiffs' Bivens and
section 1983 claims against Battelle rely on Battelle's
alleged co-conspirator status, Battelle's motion is granted
as to the federal claims (claims 1 and 2).

    B.    STATUTE OF ULTIMATE REPOSE, ORS 12.115(1)

The statute of ultimate repose issue is raised by
defendant DiIaconi, as well as Batelle.

ORS 12.115(1) provides, in part:

In no event shall any action for negligent injury

8 - ORDER

> to person or property of another be commenced more
> than 10 years from the date of the act or omission
> complained of.

The conduct from which the seventh claim for relief

(negligence or gross negligence) arises admittedly ceased in

1973.  See, Amended Complaint, ¶ 59.  Battelle's and

DiIaconi's motions to dismiss are granted as to the

negligence claim (claim 7).

Battelle and DiIaconi also seek to apply ORS

12.115(1) to the other claims for relief, relying on Johnson

v. Star Machinery Co., 270 Or. 694 (1975).  That case held

that the negligence statute of ultimate repose was

applicable to the then newly emerging tort of products

liability.  The court reasoned that, had the legislature

known of products liability or anticipated its development,

it would have included such cases within the purview of the

statute.  The Johnson case is not properly extended to all

other areas of tort law.  The other claims for relief (e.g.

fraud, battery, intentional infliction of emotional

distress, strict liability, loss of consortium, breach of

fiduciary duty) were known to the legislature when it

enacted ORS 12.115(1).

C.    STATUTE OF LIMITATIONS, ORS 12.110 (State Law
      Claims)

Battelle's motion asks that all state and federal

claims be dismissed under ORS 12.110.  Because this court

has already decided that the Amended Complaint does not

9 - ORDER

state a claim for relief against Battelle on the federal
claims, only the state law claims are discussed in this
section.

Defendants Totter and Liverman (Bivens defendants)
and DiIaconi also raise the statute of limitations issue
with respect to the state claims and their arguments are
addressed herein.  Defendants maintain that even if not
barred by the statute of repose, plaintiffs' claims are
barred by ORS 12.110, which establishes a two year statute
of limitations for "any injury to the person or rights of
another."

Relying on <u>Doe v. American Red Cross</u>, 322 Or. 502
(1996) and <u>Gaston v. Parsons</u>, 318 Or. 247 (1994), plaintiffs
argue that the statute of limitations on the state claims
begins to run when, among other factors, a plaintiff
discovers that he or she has suffered "legally cognizable
harm." <u>American Red Cross</u>, 322 Or. at 511; <u>Gaston</u>, 318 Or.
at 255.  Both cases hold that harm is legally cognizable if
it is the result of "tortious conduct."  The Amended
Complaint alleges that plaintiffs did not discover, could
not have discovered, or in the exercise of due diligence
have reason to discover the critical facts regarding the
acts perpetuated by defendants until a speech given by
Department of Energy Secretary Hazel O'Leary in December of
1993.  A.C., ¶ 2.

In <u>American Red Cross</u>, 322 Or. 502, a plaintiff

10 - ORDER

brought an action on behalf of her deceased husband seeking damages resulting from allegedly negligent transmission of the HIV virus to her husband during a transfusion in 1985. In 1987, plaintiff's husband was informed that the blood defendant had provided may have been HIV positive. Plaintiff's husband tested positive shortly thereafter. On defendants' motion for summary judgment, plaintiff conceded that she and her husband knew more than two years prior to filing suit that her husband was HIV positive, that his condition could lead to serious illness or death, and the HIV positive condition was the result of having received tainted blood from defendants. Nevertheless, the court concluded that plaintiff's claim was not time barred as a matter of law since there was a question of fact as to whether plaintiff and her husband "had notice that his HIV infection might have been caused by defendants' tortious conduct." Id. at 512. According to the court, "[w]hether a reasonable person of ordinary prudence would be aware of a substantial possibility of tortious conduct is a question of fact that depends upon the nature of the harm suffered, the nature of the medical procedure, and other relevant circumstances." Id. (citing Gaston, 318 Or. at 256).

Plaintiffs here claim it cannot be said that they should have been aware of the tortious nature of defendants' conduct as a matter of law prior to O'Leary's speech, because defendants withheld facts, made false assurances,

11 - ORDER

and fraudulently concealed information.  Plaintiffs'

memorandum argues that

> [w]hile Mr. Bibeau may have been aware that he was
> subjected to what he ambiguously understood to be
> "x-ray radiation" and other tests in association
> with some kind of experimental program during his
> imprisonment, and while he experienced certain
> health defects, about which he may have harbored
> suspicions concerning their connection to the
> Experiments (but which were discounted and
> assuaged due to the assurances of Heller and
> defendant medical professionals), not only could
> he not have reasonably understood defendants'
> conduct to be "tortious," he could not have
> discovered the "critical facts" surrounding the
> existence of his injuries and their connection to
> defendants' conduct.

Response, p. 13.

Those "critical facts" of which plaintiffs argue

they could not have been aware are:

1.    The quantity and significance of the dose they

      received.

2.    The true purposes of the experiment.

3.    That defendants failed to take adequate precautions in

      performing the experiments.

4.    That Heller and defendants were aware that the

      radiation utilized could cause cancer and other short

      and long term harmful effects, and thus, that

      plaintiffs were lied to, and their consent was

      fraudulently induced.

5.    That they had been injected with radioactively labeled

      hormones and other substances.

6.    That the doses of radiation and other substances they

12 - ORDER

received as part of the Experiments have significantly
increased their likelihood of contracting further
serious injury and/or disease.

7.    That the defendants did not provide the requisite
      scientific or medical knowledge that would have
      allowed them to evaluate the radiation doses.

8.    That defendants perpetrated a conspiracy to cover up
      the nature and extent of the experiments.

See, Response, pp. 25-26.

        Plaintiffs note that even after the O'Leary speech
and purported new era of openness, plaintiffs' attempts to
obtain facts about the Heller experiments were rebuffed.
Indeed, as a result of the Bibeau's numerous inquiries,
O'Leary herself wrote a let·· . to the DOC requesting
information on the Heller experiments.  The director of
DOC's letter in response acknowledges the government's prior
"unwillingness to acknowledge responsibility for the
research."  In responding directly to Mr. Bibeau, the DOC
director, as late as January 6, 1994, stated ". . . I'm
afraid I can provide you with little information about the
study.  We do not have records as to the date and nature of
your participation in the study."  See, Response, pp. 24-25,
n. 16.

        Defendants retort that in 1976 and 1977 at least
eleven actions were filed by subjects of the Heller
experiments.  All were eventually settled and/or dismissed.

13 - ORDER

Obviously, defendants argue, the inmate subjects who filed
these cases knew enough about the experiments and their
alleged injuries to file complaints 20 years ago.  The most
recent similar inmate claim considered by this court was
dismissed on statute of limitations grounds.  See,
Schoonover v. Oregon, Civ. No. 88-6597 (D.Or. 1989).
Several other similar cases were also previously dismissed
on statute of limitations grounds by judges of this court.
(These dismissals were prior to Gaston and American Red
Cross).  Defendants further argue that because the Oregon
legislature provided, in 1987, for persons who were
subjected to radiation while inmates to receive an annual
evaluation of the effects of the radiation, plaintiffs must
be charged with knowledge of the statute, and 1987 must
serve as the latest date when their claims could have
accrued.  Even if members of the putative class were
incarcerated in 1987, defendants argue, their claims accrued
no more than five years later, pursuant to ORS 12.160 (which
suspends the statute of limitations for a maximum of five
years for minors, the insane and the imprisoned).  At the
latest, defendants contend, the statute began to run in
1992, barring claims after 1994.  The present action was
filed in 1995.

     "A complaint should not be dismissed for failure
to state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim

14 - ORDER

which would entitle him to relief." Parks School of Business. Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). In reviewing a 12(b)(6) motion, the court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, NL Indus.. Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986), regardless of plaintiffs' ability to prove their allegations, or possible difficulties in making such proof. Allison v. California Adult Auth., 419 F.2d 822, 823 (9th Cir. 1969). Plaintiffs' Amended Complaint alleges facts which, if true, give rise to a possible inference that although plaintiffs may have had serious suspicions, they did not have knowledge that defendants' acts were tortious, and thus that they had a cognizable claim, and could not have had this knowledge until after the 1993 O'Leary speech and subsequent revelations by the government. At the minimum there appears to be a fact issue on this point. The fact that eleven suits were brought in 1977 and 1978 does not settle the matter. See Conmar v. Mitsui, 858 F.2d 499, 504 (9th Cir. 1988) (separate suit brought earlier making similar allegations arising out of same event did not put plaintiff on notice of claims as a matter of law, even if plaintiff had known of it); In re Swine Flu Products Liab. Litig., 764 F.2d 637, 640 (9th Cir. 1985) (genuine issue existed regarding whether plaintiff was accountable for public accounts and community awareness of link between

15 - ORDER

defendants' conduct and injury; defendants' summary judgment
motion denied).

Defendants' motions to dismiss the state claims
based on the statute of limitations are denied.

D.   X-RAYS AS AN ULTRAHAZARDOUS ACTIVITY

Battelle cites two cases concerning the
therapeutic use of x-rays in an attempt to show the Heller
experiments' use of x-rays was not ultrahazardous as a
matter of law.   See, Brown v. Cromerford, 99 Or. App. 60, 63
(1989); Koos v. Roth, 293 Or. 670, 682 (1982).   These cases
deal solely with x-rays in a therapeutic context.
Battelle's argument ignores the allegation that the Heller
experiments administered non-therapeutic doses to
susceptible body areas and does not address other alleged
aspects of the experiments (e.g., testicular injections of
hormones and radioactive substances, testicular biopsies and
other tests, etc.).

The Restatement (Second) of Torts, section 520, as
adopted in Koos v. Roth sets forth the standard for
determining whether an activity is abnormally dangerous.
The amended complaint alleges the elements.   First, it
alleges that the experiments posed risk of serious injury,
known at the inception of the experiments.   A.C., ¶ 92.
Second, that the risks created could not have been
eliminated with reasonable care.   A.C., ¶¶ 182, 184, 185.
Third, that the experiments were unique and not a matter of

16 - ORDER

common usage.  A.C., ¶ 1.  Fourth, that they were
inappropriate to the place in which they occurred (because
of coercive prison environment).  A.C., ¶¶ 67-70.  Finally,
that the value to the community derived from the experiments
is far outweighed by the adverse impact on the subjects.
A.C., ¶¶ 182, 184, 185.  Because there is a geniune issue as
to whether the Heller experiments' use of x-rays was
ultrahazardous under the above criteria, Battelle's motion
is denied as to this claim.

### E.   CIVIL CRIMES AGAINST HUMANITY

Battelle moves to dismiss plaintiffs' tenth claim
for relief ("Civil Responsibility for Crimes Against
Humanity"), arguing that there is no recognized action for
"civil liability for crimes against humanity."  The Bivens
defendants and PNRF and Rowley also raise this point.

Plaintiffs claim that international law, and
specifically the International Covenant on Civil and
Political Rights, 6 I.L.M. 368, and the Nuremburg Code,
provide an enforceable body of law which gives rise to their
tenth claim for relief.  The Covenant, while a treaty, is
not self-executing, and therefore does not give rise to
privately enforceable rights under United States law.
Igartua de la Rosa v. United States, 32 F.3d 8, 10 n.1 (1st
Cir. 1994), cert. denied, 115 S.Ct. 1426 (1995).

As to the Nuremberg Code argument, plaintiffs rely
on In re Cincinnati Radiation Litig., 874 F.Supp. 796

17 - ORDER

(S.D.Ohio 1995), a case involving government sponsored radiation experiments conducted on cancer patients who were falsely told they were receiving cancer treatment. The relevant portion of that decision occurs in the context of denying a motion to dismiss a section 1983 claim for an alleged violation of substantive due process. The complaint in that claim did not contain an independent claim based on the Nuremburg Code. The court in In re Cincinnati held that substantive due process protects an individual from nonconsensual medical experimentation and that the complaint therefore stated a claim under the Constitution. The court further held that defendants were not entitled to qualified immunity because their actions were beyond the scope of their delegated powers. Id. at 814.

The court's discussion of the Nuremburg Code was dictum, and did not discuss whether the Code could form the sole basis for a cause of action. Rather, the discussion of the Code had to do with whether there existed a clearly established right for purposes of a qualified immunity analysis. The Code is a part of the final judgment of a military tribunal in one of the trials which occurred in Nuremburg, Germany after World War II; it does not purport to create causes of action for private litigants.

Plaintiffs argue that Justice O'Connor's dissent in United States v. Stanley, 483 U.S. 669, 708-710 (1987) supports the conclusion that they have stated a valid claim.

18 - ORDER

Stanley involved whether a plaintiff serviceman was entitled
to bring a Bivens action against defendants who
surreptitiously gave him LSD.  Defendants had acted
according to an Army plan to study the effects of drugs on
humans.  The majority decided against plaintiff, holding
that a Bivens action is not available for "injuries that
arise out of or are in the course of activity incident to
service." 483 U.S. at 684.  Justice O'Connor opined that
due process should guarantee as much as the Nuremberg Code,
and thus she would have decided that a Bivens action could
lie.  Id. at 710 (O'Connor, J., dissenting).  Her dissent
has been adopted as controlling in situations not involving
military service.  See, In re Cincinnati, 874 F.Supp. 796;
Whitlock v. Duke Univ., 637 F.Supp. 1463 (1986).

     Like the decision in In re Cincinnati, Justice
O'Connor's dissent does not purport to create a right of
action directly out of the Nuremberg Code or any other body
of international law.  Battelle's, PNRF and Rowley's, and
the Bivens defendants' motions to dismiss plaintiffs' tenth
claim for relief are granted.

II.  DIIACONI'S MOTION TO DISMISS (#57)

     At the time of the experiments, Dr. DiIaconi was an
employee, agent and/or contractor of the DOC.  He is sued in
his individual capacity as well as his former official
capacity.  Dr. DiIaconi is alleged to have assisted Dr.
Heller in extracting seminal fluid, semen, urine and

19 - ORDER

biopsies from the inmates involved.  A.C., ¶ 36.  Plaintiffs
allege he assisted Heller in interviewing, selecting,
supervising, counseling, coercing and practicing non-
therapeutic experimental medicine on the inmates.  A.C., ¶
38.  Plaintiffs also allege he assisted others in performing
vasectomies, biopsies, and/or other invasive procedures on
the inmates.  A.C., ¶ 42.

DiIaconi moves to dismiss on four grounds (1)
statute of ultimate repose; (2) statute of limitations;(3)
collateral estoppel; and (4) qualified immunity.

DiIaconi's statute of ultimate repose argument is
meritorious only as to the negligence claim, as discussed
above in section II.B.

A.   STATUTE OF LIMITATIONS (Federal Claims)

The Bivens defendants also raise the statute of
limitations issue as to the federal claims.  The limitations
period for both the Bivens and section 1983 claims is
borrowed from the personal injury statute of the state in
which the action is pending.  Wilson v. Garcia, 471 U.S.
261, 268 (1985).  With respect to federal accrual law,
defendants' argument is essentially the same as their state
law argument: that plaintiffs allegedly knew, or should have
known, the critical facts surrounding their injuries, and
the causes of those injuries, more than two years prior to
filing this action.  Plaintiffs claim that the discovery
rule applies.  Under the discovery rule, which is most often

20 - ORDER

applied in a medical malpractice setting where plaintiffs can have difficulty discovering the critical facts regarding manifestation of an injury and/or its causes, claims do not begin to accrue until the critical facts associated with the claims become known, or should have become known.

In *Barrett v. United States*, 689 F.2d 324, (2d Cir. 1982), *cert. denied*, 462 U.S. 1131 (1983), plaintiff brought an action under the Federal Tort Claims Act and section 1983 alleging negligence in the creation and administration of an army chemical weapons experiment and conspiracy to cover up facts of plaintiff's decedent's death after being injected with mescaline while unknowingly serving as a test subject. The *Barrett* court first noted that while most common in the medical malpractice area, the discovery rule

> may be appropriate in non-malpractice cases where plaintiffs face comparable problems in discerning the fact and cause of their injuries. . . For example, the diligence-discovery rule has been applied where . . . the Government conceals its negligent acts so that the plaintiff is unaware of their existence. . . [R]ead into every federal statute of limitations is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit.

*Id.* at 327.

The Ninth Circuit endorsed the diligence-discovery rule in *In re Swine Flu*, 764 F.2d 637, where the court held that the rule that a claim accrues at the time of the injury

21 - ORDER

has been supplanted in cases where the nature of the tort,
or the character of the injury, prevent knowledge of the
injury and/or its causes.  Relying on Barrett, the Ninth
Circuit recognized that a plaintiff who may be blamelessly
ignorant of the existence or cause of his injury should be
accorded the benefits of the more liberal accrual standard.
764 F.2d at 639-640.

Plaintiffs claim that the discovery rule applies
here because of the presence of four factors: (1) the
injuries suffered by the subjects are latent (e.g.
significantly increased risk of cancer)--by definition they
have no current manifestations and are nearly impossible to
discover without further material information; (2) nearly
all physical injuries suffered involve complex scientific
causal relationships, requiring data and scientific
knowledge about radiochemistry and health physics, available
only to a small group of scientists, many of whom are
employees of defendants; (3) defendant doctors and the other
defendants assured the victims that any short-term injuries
they suffered were either unrelated to the experiments or
merely transitory and that the experiments would have no
long-term health effects; and (4) defendants deliberately
withheld, and fraudulently concealed critical facts central
to plaintiffs' claims.

The latter two allegations alone warrant denial of
defendants' motions as to the federal claims.  In both Swine

22 - ORDER

<u>Flu</u>, 764 F.2d at 641, and <u>Rosales v. United States</u>, 824 F.2d
799, 804 (9th Cir. 1987), the Ninth Circuit held that where
a plaintiff relies on assurances by physicians that their
conditions are normal and not the result of any wrongdoing
or malpractice, the plaintiff may not be found to have
failed to exercise reasonable diligence because he did not
earlier pursue his claim. In the instant case, plaintiffs
allege that Mr. Bibeau relied on the repeated assurances of
Dr. Heller, defendants Drs. DiIaconi and Leon, and defendant
Rowley, a medical technician and researcher, and other
defendants regarding the purported safety of the experiments
and alleged temporary nature of any adverse effects. A.C.,
¶¶ 71, 92, 93, 120, 123, 136, 140-149.

    Moreover, deliberate withholding and fraudulent
concealment of critical facts about a claim has consistently
been held to toll accrual. <u>See, e.g.</u>, <u>Barrett</u>, 689 F.2d at
324, 333. In <u>Barrett</u>, plaintiff, the daughter of a deceased
subject of an army chemical warfare experiment, alleged the
government had engaged in conspiracy to cover up critical
facts regarding her father's death. The court stated:

> [The decedent's] family knew that he had died and
> that the direct cause of his death was, at least
> partly, the mescaline injection. What it was
> unaware of and had no reason to suspect . . . was
> that this was a death without reason caused by the
> government's alleged negligence.

<u>Barrett</u>, 689 F.2d at 329.

    Defendants motions to dismiss the federal claims

23 - ORDER

based on the statute of limitations are denied.

B.   COLLATERAL ESTOPPEL

As a preliminary matter, collateral estoppel is a
defense and is inappropriately raised on a motion to
dismiss.  See Blonder-Tongue Lab. v. University of Illinois
Found., 402 U.S. 313, 350 (1971) ("[C]ollateral estoppel [is
an] affirmative defense[] that must be pleaded.")

In order to establish the defense of collateral
estoppel a defendant must show: (1) that a party against
whom the defense is asserted was a party to or in privity
with a party to a prior lawsuit, and (2) that the issue was
fully and fairly litigated in the prior lawsuit.  Parklane
Hosiery v. Shore, 439 U.S. 322, 327 (1970).

DiIaconi argues plaintiffs' claims are barred by
the earlier case of Schoonover v. Oregon, Civ. No. 88-6597
(D.Or. 1989).  DiIaconi summarily states that the plaintiff
in Schoonover was one of the 67 inmates who was part of the
Heller experiments and had the same interests that
plaintiffs here assert.  This argument is unavailing.
Plaintiffs in the present action did not own an interest in
the Schoonover suit, were not parties to that case, nor
would they have benefitted from the outcome of that case.
There is no privity here.  In the case cited by DiIaconi, In
re Gottheiner, 703 F.2d 1136, 1139 (9th Cir. 1983), a person
was considered in privity with a corporation because he
owned all or most of its shares and controlled its

24 - ORDER

activities, and thus he could fairly be said to have had his interests aligned with those of the corporation. DiIaconi's motion based on collateral estoppel is denied.

C. **QUALIFIED IMMUNITY (Substantive Due Process--Right to Bodily Integrity)**

DiIaconi's qualified immunity argument focuses on plaintiffs' substantive due process--right to bodily integrity section 1983 claim. The Bivens defendants also raise the qualified immunity issue as to this claim.

Defendants claim they are shielded from suit by qualified immunity because their conduct did not violate clearly established rights of which a reasonable person would have known. To determine whether an official is entitled to qualified immunity, a court must determine as a matter of law (1) whether the right allegedly violated was clearly established at the time of the alleged violation, and (2) whether, in light of the law, a reasonable official could have believed his conduct to be lawful. Act Up!/Portland v. Bagley, 988 F.2d 686, 871 (9th Cir. 1993).

In Anderson v. Creighton, the Supreme Court determined that for a constitutional right to be established:

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-

25 - ORDER

existing law the unlawfulness must be apparent.
483 U.S. 635, 640 (1987)(citations omitted).

DiIaconi first argues that "before 1973 [when the
experiments terminated] it was not clearly established that
prison inmates could not voluntarily consent to medical
testing." Memorandum in Support, p. 14. Bivens defendants
also raise the issue of voluntariness. However this
characterization of the issue distorts the facts as alleged.
The subjects of the experiments, although they ostensibly
consented to x-ray irradiation of their gonads, allegedly
were not fully informed of the effects of the non-
therapeutic x-ray radiation. Defendants' voluntariness
argument fails at this stage of the litigation because
plaintiffs have alleged that the subjects of the experiments
were purposely misled in that they were not informed of the
purpose of the experiments nor of the potential (especially
long-term) effects of the experiments.

In In re Cincinnati Radiation Litig., 874 F.Supp.
796, 805 (S.D.Ohio 1995), cancer patients, in human
radiation experiments contemporaneous with the Heller
experiments, were misled as to the purpose and nature of the
x-rays to which they were exposed and instead of being told
the truth--that they were subjects of non-therapeutic
experiments which were done to determine the physical and
psychological effects of radiation -- were told the x-ray
exposure was therapeutic. The court held that "[w]hen a

26 - ORDER

person is purposefully misled about such crucial facts as
these, he can no longer be said to exercise the degree of
free will that is essential to the notions of
voluntariness." Plaintiffs have alleged sufficient facts to
withstand defendants' voluntariness argument.

      Having so decided, the issue here becomes
whether, between 1963 and 1973 (the duration of the
experiments), there was a clearly established right to
bodily integrity. The In re Cincinnati case, involving
experiments contemporaneous with the Heller experiments, is
again instructive:

> [T]he contours of the right to be free from
> unwanted bodily intrusions has been developed over
> a long line of cases. As early as 1884, the
> Supreme Court recognized that the liberty right of
> the Fourteenth Amendment protected the integrity
> of one's body. See Hurtado v. People of
> California, 110 U.S. 516, 563, 4 S.Ct. 111, 121,
> 28 L.Ed. 232 (1884). In 1891, the Supreme Court
> explicitly stated that "no right is more sacred,
> or is more carefully guarded, by the common law,
> than the right of every individual to possession
> and control of his own person, free from all
> authority of law." Union Pacific Railroad Co. v.
> Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001,
> 35 L.Ed. 734 (1891).

      The right to bodily integrity was also recently
recognized to have existed at the time of the Heller
experiments in Stadt v. University of Rochester, 921 F.Supp.
1023 (W.D.N.Y. 1996). In that case, a plaintiff brought an
action under the Federal Tort Claims Act claiming, *inter*
*alia*, that defendants violated the right to bodily
integrity. In 1945, as part of the government's plan to

27 - ORDER

develop nuclear weapons, plaintiff's decedent was, without
her knowledge, allegedly injected with plutonium and studied
over a period of several years. In rejecting a defendant's
claim of qualified immunity, the court stated that the case
involved

> the right to be free from non-consensual
> experimentation on one's body--the right to bodily
> integrity--a right which has been recognized
> throughout this nation's history. See Albright v.
> Oliver, ___ U.S. ___, ___, 114 S.Ct. 807, 812, 127
> L.Ed.2d 114 (1994) (finding that "the protections
> of substantive due process have for the most part
> been accorded to matters relating to marriage,
> family, procreation, and the right to bodily
> integrity.") (citations omitted); Schmerber v.
> California, 384 U.S. 757, 772, 86 S.Ct. 1826,
> 1836, 16 L.Ed.2d 908(1966) (stating that "[t]he
> integrity of an individual's person is a cherished
> value of our society."; Skinner v. State of
> Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62
> S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (holding
> that sterilization performed without consent
> deprived the individual of a "basic liberty.").

Id. at 1027. See also, Rochin v. California, 342 U.S. 165,
169 (1952) (government's conduct in forcibly extricating
narcotics capsules from criminal defendant's stomach
violated the Fifth Amendment because the forced stomach
pumping "offended those canons of decency and fairness which
expressed the notions of justice of English-speaking peoples
even toward those charged with the most heinous offenses.")

     The Bivens defendants' argument that, since many
states engaged in non-consensual experiments at the time of
the Heller experiments, there cannot be said to be at that
time a clearly established right, is meritless. Assuming

28 - ORDER

these non-consensual experiments are analogous to the Heller experiments, the unconstitutional deprivation of citizens' established rights do not somehow become constitutional merely because they are widespread or frequent. To so argue is to sanction unconstitutional behavior solely because of its repeated occurrence.

This court finds that plaintiffs had a clearly established right to bodily integrity during the time of the experiments such that the defendants should have known that their alleged conduct, if it occured, would violate the Constitution.

## III. PNRF'S AND ROWLEY'S MOTION TO DISMISS (#62)

PNRF and Rowley move to dismiss plaintiffs' tenth claim for relief ("Civil Responsibility for Crimes Against Humanity"). Dr. Rowley was Dr. Heller's top assistant. Heller and Rowley were "employees, agents, and/or contractors" of PNRF, and are alleged to have conducted the experiments under PNRF's direction and supervision. A.C., ¶ 33. PNRF is alleged to have conducted the experiments under contract with the AEC.

Rowley and PNRF argue that there is no recognized action for "civil liability for crimes against humanity." Their motion is granted for the reasons set out above in the section dealing with defendant Battelle's motion to dismiss (section II.E.).

29 - ORDER

IV.  **TOTTER'S AND LIVERMAN'S ("BIVENS DEFENDANTS") MOTION TO**
     **DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**
     **(#64)**

Dr. Totter was the director of the AEC's Division of
Biology and Medicine from 1967 to 1972.  Dr. Liverman was
the director of the AEC Division of Biology and Medicine
from 1967 to 1972.  The complaint does not allege any direct
involvement by Totter and Liverman in the Heller
experiments; it alleges that "[t]he [Division of Biology and
Medicine] was the entity under the AEC with supervisory
liability over biomedical research of humans exposed to
radiation."  A.C., ¶ 26.  Totter and Liverman are sued in
their individual capacities and former official capacities.

They move to dismiss, and alternatively for summary
judgment, on five grounds: (1) lack of personal
jurisdiction; (2) absolute immunity; (3) qualified immunity;
(4) statute of limitations; and (5) the tenth claim for
relief (crimes against humanity) does not state a claim.
The merits of grounds (4) and (5) are discussed above as
part of the other defendants' similar motions.

A.  **PERSONAL JURISDICTION**

The Bivens defendants argue plaintiffs' claims
against them should be dismissed for lack of personal
jurisdiction.  Totter and Liverman were successive directors
of the AEC's Division of Biology and Medicine (DBM).  The
complaint alleges that they "oversaw, funded, approved,

30 - ORDER

supervised, endorsed and/or reviewed the results of the
Heller experiments" from the AEC offices in Washington, D.C.
A.C., ¶ 30. It further alleges that as directors of the
DBM, they were responsible for overseeing the AEC's entire
human experimentation program, which included the Heller
experiments. A.C., ¶¶ 26-28.

In order to avoid a motion to dismiss for lack of
personal jurisdiction, plaintiffs need only make a prima
facie showing of facts which support a finding of
jurisdiction. <u>Data Disc. Inc. v. Systems Technology
Assocs., Inc.</u>, 557 F.2d 1280, 1285 (9th Cir. 1977). In the
absence of a federal statute establishing the territorial
extent of a federal court's jurisdiction, a district court
must look to the forum state's jurisdictional provisions.
Fed. R. Civ. P. 4(k)(1)(A).

Plaintiffs claim this court has jurisdiction
pursuant to Or. R. Civ. P. 4D(1) or 4L. Rule 4L confers
jurisdiction over a defendant to the extent it is not
unconstitutional. Rule 4D reads, in pertinent part:

> D    Local injury; foreign act
> In any action claiming injury to person or
> property within this state arising out of an act
> or omission outside this state by the defendant,
> provided in addition that at the time of the
> injury either:
>
> D(1) Solicitation or service activities were
> carried on within this state by or on behalf of
> defendant. . . .

Because the acts and omissions of the Bivens defendants, as

31 - ORDER

alleged in the complaint and described in the preceding
paragraph fall within the parameters of this rule, the court
has jurisdiction.  Plaintiffs have alleged sufficient facts
to show their alleged injuries arise out of the Bivens
defendants out of state conduct.  The allegations of the
complaint also support the second element of the Rule, that
"solicitation or service activities were carried on within
this state by or on behalf of the defendant."  The complaint
alleges that the experiments which Bivens defendants
supervised were carried out, on their behalf and on behalf
of the AEC, on Oregon citizens in an Oregon facility by
Oregon public officials and private persons.

Alternatively, even if Rule 4D(1) is inapplicable,
the court has jurisdiction under the "catch all" provision
of Rule 4L, which confers jurisdiction over non-resident
defendants to the outer limits of due process.  Fone v.
America, Inc. v. Integretel, Inc., 779 F.Supp. 497 (D.Or.
1991).

In analyzing whether the exercise of personal
jurisdiction over a defendant comports with due process, the
Ninth Circuit asks three questions: (1) whether the
defendant has done some act to consummate some transaction
within this forum, (2) whether the claim arises out of the
transaction, and (3) whether the exercise of jurisdiction
over the defendant would be reasonable.  Sinatra v. National
Enquirer, Inc., 854 F.2d 1191, 1194 (9th Cir. 1988).  Viewed

32 - ORDER

in the light most favorable to plaintiffs, the amended
complaint makes out a prima facie case for the exercise of
jurisdiction over the Bivens defendants under the Sinatra
test: as directors of DBM, Totter and Liverman wilfully
authorized and supervised the experiments in Oregon, as a
result of which plaintiffs suffered injuries, giving rise to
their claims here.

Defendants argue that foreseeability of an in-
state effect is an insufficient basis for the exercise of
jurisdiction over a non-resident defendant. However, it was
not merely foreseeable, but indeed certain that the
experiments would have effects in Oregon: the experiments
were conducted on a captive Oregon population. The injuries
for which plaintiffs now seek redress stem directly from
defendants' forum-related activities. Moreover, the amended
complaint alleges that the Bivens defendants conspired with
Oregon state officials and private contractors to perform
the tortious acts complained of here. In Ziegler v. Indian
River County, 64 F.3d 470 (9th Cir. 1995), the court held
that a conspiracy by a non-resident defendant to enlist
others within the forum state to commit a tortious act
amounted to a "purposeful injection" into the forum state
and provided an appropriate basis for the exercise of
personal jurisdiction over the non-resident defendant. This
court finds that it has personal jurisdiction over the
Bivens defendants.

33 - ORDER

### B. ABSOLUTE IMMUNITY

Bivens defendants claim the state law tort claims against them (claims 3 through 9) are barred as a matter of law and that the United States must be substituted as defendant on these claims pursuant to the Westfall Act, 28 U.S.C. § 2679(b), which provides that an action against the United States under the Federal Tort Claims Act shall be the exclusive remedy for the negligent or wrongful act or omission of any employee of the government committed while the employee was acting within the scope of office or employment. Section 6 of the Westfall Act states that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States . . . and the United States shall be substituted as party defendant." 28 U.S.C. § 2679(d)(1). "Upon certification, the employee is dismissed from the action and the United States is substituted as defendant. The case then falls under the governance of the Federal Tort Claims Act." <u>Gutierrez de Martinez v. Lamagno</u>, 115 S.Ct. 2227, 2229 (1995).

The Attorney General's designee has certified that Drs. Totter and Liverman were acting within the scope of their office or employment as employees of the government at

34 - ORDER

the time of the experiments.  Plaintiffs concede that the
government must be substituted for Totter and Liverman for
claims 3 through 9.  Defendants Totter's and Liverman's
motion to dismiss is granted with respect to claims 3
through 9 without prejudice to plaintiffs' right to further
amend the complaint to conform to the Westfall Act and to
add a claim for negligent supervision.

    C.   QUALIFIED IMMUNITY

The Bivens defendants' qualified immunity
arguments focus on plaintiffs' substantive due process--
right to bodily integrity claim; on the substantive due
process--right of access to the courts section 1983 claim;
and on the procedural due process--right of access to the
courts Section 1983 claim.  The first of these is discussed
above in the section dealing with DiIaconi's claim of
qualified immunity.

As noted above, to determine whether an official
is entitled to qualified immunity, a court must determine as
a matter of law (1) whether the right allegedly violated was
clearly established at the time of the alleged violation,
and (2) whether, in light of the law, a reasonable official
could have believed his conduct to be lawful.  Acr
Up!/Portland v. Bagley, 988 F.2d at 871.

    1.   The Right of Access to the Courts

        a.   Substantive Due Process

Plaintiffs contend all defendants

35 - ORDER

violated plaintiffs' substantive right of access to the
courts by concealing the critical facts of the experiments
from the subjects.  The right of access to the courts is a
fundamental right grounded in the due process clause.  See
Wolff v. McDonald, 418 U.S. 539, 556 (1974).  A
constitutional violation of the right of access has occurred
when

> [s]tate officials wrongfully and intentionally
> conceal information crucial to a person's ability
> to obtain redress through the courts, and do so
> for the purpose of frustrating that right, and
> that concealment and the delay engendered by it
> substantially reduce the likelihood of one's
> obtaining the relief to which one is otherwise
> entitled.

Crowder v. Sinyard, 884 F.2d 804, 812 (5th Cir. 1989)
(citing Ryland v. Shapiro, 708 F.2d 967 (5th Cir. 1983).
This right was clearly established at the time of the Heller
experiments.  See Johnson v. Avery, 393 U.S. 483 (1969);
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306
(1950); Brinkerhoff-Ferris Trust & Sav. Co. v. Hill, 281
U.S. 673 (1930); see also In re Cincinnati, 874 F.Supp. at
824 (right of access to the courts clearly established at
time of non-consensual cancer radiation experiments
conducted between 1960 and 1972).

    b.    Procedural Due Process

                Plaintiffs claim that all defendants
violated plaintiffs' procedural due process rights by
concealing the critical facts of the experiments from the

36 - ORDER

subjects.  As early as 1882, the Supreme Court held that a cause of action is a type of property interest encompassed by the due process clause of the Fourteenth Amendment.  See Pritchard v. Norton, 106 U.S. 124, 132 (1882) ("[a] vested right of action is property in the same sense in which tangible things are property, and is equally protected from arbitrary interference.") This right was clearly established at the time of the alleged conduct so that a reasonable official would have known his conduct violated the law.

This court finds that the rights allegedly violated were clearly established at the time of the Heller experiments.  The Bivens defendants' motion to dismiss based on qualified immunity is denied.

V.    CONCLUSION

Defendant Battelle's motions to dismiss (## 31, 68) are GRANTED IN PART AND DENIED IN PART as follows: granted as to the federal claims (claims 1 and 2), granted as to the negligence claim (claim 7), granted as to the crimes against humanity claim (claim 10), denied as to the remainder. Defendant DiIaconi's motion to dismiss (#57) is GRANTED IN PART AND DENIED IN PART as follows: granted as to the negligence claim (claim 7), denied as to the remainder. Defendants PNRF and Rowley's motion to dismiss (#62) is GRANTED.  Defendants Totter and Liverman's (Bivens defendants) motion to dismiss (#64) is GRANTED IN PART AND DENIED IN PART as follows: granted as to the state claims

37 - ORDER

(claims 3 through 9), granted as to the crimes against
humanity claim (claim 10), denied as to the remainder.
Plaintiffs' are allowed 30 days leave to amend the complaint
as discussed herein.

    IT IS SO ORDERED.

    DATED this 27th day of September, 1996.


                        *Michael R. Hogan*
                    UNITED STATES DISTRICT JUDGE

**38 - ORDER**